## THE STATE ex rel. SUPREME LODGE KNIGHTS OF PYTHIAS v. VANDIVER, Superintendent of Insurance Department of Missouri.

#### In Banc, June 26, 1908.

1. **LIFE INSURANCE: Equality of Business Rights.** Life insurance is a business, whatever may be the motive of the insurer; and where two concerns are licensed to do the same business, everything else being equal, the license cannot be given to one on easier terms than is given to the other, by legislative enactment or otherwise. But the General Assembly may give to a certain class a fairly restricted license without impinging on the constitutional demand of equality before the law.

2. **FRATERNAL SOCIETIES: Extent of Powers: Right to License: Policies.** Fraternal beneficiary associations are authorized "to make provision for the payment of benefits in case of death and may make payment of benefits in case of accident," etc., and "the fund from which the payment of such benefits shall be made, and the fund from which the expenses of the association shall be defrayed, shall be derived from assessments or dues collected from its members," and this is the whole extent of the authority of such an association in this State, and when such a corporation organized under the laws of the Dis-

trict of Columbia applies for a license to do business in this State its right thereto is to be determined by this legislative authority, and to do that, not its charter alone, but the policies it purposes to issue, are to be examined.

3. ———: ———: **Paid-Up and Non-Forfeitable Policies.** A fraternal beneficiary association has no power to issue a policy which is to be paid up in twenty years, nor one which is to be non-forfeitable after 36 monthly assessments are paid, nor can the Superintendent of Insurance license a foreign company to do business in this State that issues such policies.

4. ———: ———: ———: **Additional Assessments.** Nor is the right of such a company to issue a twenty-year paid-up policy affected by the fact that it contains a provision that if the assessments are more than needed the excess is to be credited on subsequent assessments, or if not sufficient the shortage is to be added to such subsequent assessments. That does not distinguish it from an old-line company, since when it decided to issue such a policy it abandoned the National Fraternal Table of Mortality on which it had theretofore made its calculations, and adopted the American Experience Tables which call for higher premiums, and which are the basis of the calculations of the old-line companies, and experience has shown that those calculations never fail.

5. ———: ———: **Lodges and Members.** Nor does the fact that a fraternal beneficiary association has lodges, a ritual, a republican form of government, insures only members, and aims to make no profit, so distinguish a paid-up or non-forfeitable policy issued by it from like policies issued by old-line companies as to make them permissible under the statutes of this State.

6. ———: ———: **Power to Change Rates.** Nor is its lack of power to issue a twenty-year paid-up policy, or a paid-up policy for any number of years, supplied by the fact that its by-laws allow it to change the rates now fixed, and for that reason there is no fixed and unalterable contract fixed for the designated number of years.

7. ———: ———: **Act of 1897: Dues.** The Act of 1897, in using the words "or dues" in the clause, "The fund from which such benefits shall be made, and the fund from which the expense of such association shall be defrayed, shall be derived from the assessments or dues collected from members," conferred no power on fraternal beneficiary societies to issue paid-up or non-forfeitable policies. The word "dues" in that connection has no peculiarly technical meaning. On the contrary, as it is preceded by "or," it seems to be used as a synonym of "assess-

ments." At any rate, it gave such companies no power to issue such policies that was not given by the word "assessment" alone, used in the Act of 1879.

8. ———: ———: ———: **Reserve.** The Act of 1897, in providing that a "fraternal beneficial association may create, maintain, disburse and apply a reserve or emergency fund in accordance with its constitution and by-laws," did not use the word "reserve" in its technical insurance sense, and did not authorize such an association to issue paid-up or non-forfeitable policies and provide a fund with which to pay them. The provision does not compel the creation of such a fund, and authorizes the association, even when created, to disburse it "in accordance with its constitution and by-laws," that is, in any manner it may deem fit. It, therefore, conferred no new power and imposed no new obligation, even if the word had been used in the sense in which old-line companies use it.

9. ———: ———: ———: **Reserve or Emergency Fund.** The words "reserve or emergency fund" are the words found in said clause of the act, and the words "reserve" and "emergency" are convertible terms, and the purpose of the clause was to enable a fraternal beneficiary association to lay up a reasonable fund to meet an unusual emergency, such as anticipated unusual death loss, and not to authorize such companies to embark in an entirely new line of insurance.

10. ———: **General Purposes and Powers: Express and Implied.** A fraternal beneficiary association is not a life insurance corporation. The insuring of the lives of its members is not the object of its existence. That is merely an incidental and comparatively unimportant feature. Its only natural purposes are those which pertain to its moral and social character. It has no corporate power to insure the lives of its members except by express grant or a grant appearing by express implication.

## Mandamus.

PEREMPTORY WRIT DENIED.

*Carlos S. Hardy, W. M. Williams* and *R. P. & C. B. Williams* for relator.

(1) The Supreme Lodge Knights of Pythias is a fraternal beneficiary association. This court has so adjudged and the pleadings expressly admit it. Westerman v. Supreme Lodge Knights of Pythias, 196 Mo.

670; Tice v. Supreme Lodge Knights of Pythias, 204 Mo. 349. (2) The statutory test, under the Act of 1897, as to whether the relator is a fraternal beneficiary association, is not when or how the dues and assessments are to be called or paid, or the amount thereof, but "the true test as to whether this is a fraternal beneficiary association is, is it formed or organized and is it carried on for the sole benefit of its members and their beneficiaries, and not for profit? Has it a lodge system with ritualistic form of work and a representative form of government?" Westerman case, supra; Tice v. Supreme Lodge K. of P., 123 Mo. App. 85. (3) The objection to relator's benefit certificates, called in the return "certificates issued under Plan B, known as the twenty-year-payment plan," is based upon a misconception. This plan does not require the full payment of all dues and assessments necessary to mature the member's certificate to be made within the first twenty years of his membership. The by-laws of the relator, as well as the certificates themselves, as set out in the plea to the return, provide for an annual accounting, and the member holding a certificate under this plan is subject, during his entire membership, to such other or additional assessments as the experience of the society and its necessities may require. He is permitted, during the first twenty years of his membership, when his earning capacity will likely be greater than in later years, to pay an amount supposed to be enough to cover all of his assessments and dues. The society, however, as long as he remains a member, expressly reserves the right, after each annual accounting, to levy and collect additional and further assessments whenever needed, and this right continues after the twenty years as fully as before. Haydel v. Life Assn., 104 Fed. 718; Hanford v. Ben. Assn., 122 Mo. 59; Hayden v. Franklin Life, 136 Fed. 285; Elliott v. Life Assn., 163 Mo. 132; Westerman Case, supra. (4)

Relator has a right, under section 1408, Revised Statutes 1899, being section 1 of the Act of 1897, to "create, maintain, disburse and apply a reserve or emergency fund in accordance with its constitution and by-laws." Morton v. Royal Tribe of Joseph, 93 Mo. App. 91. (5) The members carrying Plan B certificates issued by the relator pay, during the first twenty years of their membership, as they have the right to do, in addition to the current cost expected by the society, also the expected cost of their insurance during the remainder of their lives, such assessments being received by the society to the credit of the members and applied to the cost of maintaining their protection as the same attaches, and the society makes no profit or receives no benefit from such payments in any way. It is simply a payment within the first twenty years of membership, in advance, of all the dues and assessments anticipated during the life of the member, subject to be increased or changed or additional assessments to be made as the actual experience of the society may require. Morton v. Royal Tribe of Joseph, 93 Mo. App. 87; Knights Templar and Masons Life Indemnity Co. v. Vail, 68.N. E. 1103. (6) Relator, as a fraternal beneficiary association, has the right to collect from its members dues and assessments in excess of the current cost of the protection granted in anticipation of future losses, and is expressly authorized by the statute to create an emergency fund or reserve fund, and in equity and good conscience it should be permitted to account to lapsed members for the excess collected from them respectively, and there is nothing in the statute which forbids the application of these advanced payments to continuing the member's certificate as long as such excess will carry it. Morton v. Royal Tribe of Joseph, 93 Mo. App. 85; Tice v. Supreme Lodge Knights of Pythias, 123 Mo. App. 85; Supreme Lodge Order of Mutual Protection v. Miester, 68 N. E.

454; Knights Templar and Masons Life Indemnity Co. v. Vail, 68 N. E. 1103. (7) Relator has the right, under the statute, to collect from its members an amount in excess of the actual cost of conducting its business during the current year. There is nothing in the statute or in the nature of a fraternal beneficiary association that will prevent it from giving to its unfortunate members the benefit of insurance protection by applying any excess payments made by them in extending their certificates for such time as such excess payments will meet the required dues and assessments. Supreme Lodge Order of Mutual Protection v. Miester, 68 N. E. 454; Knights Templars and Masons Life Indemnity Co. v. Vail, 68 N. E. 1103. (8) Relator is not issuing endowment insurance, nor does it provide for the payment of a cash surrender value to any of its certificate holders. The benefits are only payable at the death of the member and to the class of beneficiaries mentioned in the statute.

*Herbert S. Hadley,* Attorney-General, and *Frank Blake,* Assistant Attorney-General, for respondent.

(1) Fraternal beneficiary associations have no right to issue benefit certificates under the twenty-year payment plan. It is a well-settled rule of construction of grants by the Legislature to corporations, whether public or private, that only such powers and rights can be exercised under them as are expressly comprehended within the words of the act, or derived therefrom by necessary implication, regard being had to the objects of the grant. Any ambiguity or doubt arising out of the terms used by the Legislature must be resolved in favor of the public. Const., sec. 7, art. 12; Carroll v. Campbell, 108 Mo. 550; State ex rel. v. Murphy, 130 Mo. 10; State ex rel. v. Orear, 144 Mo. 157; McDermott v. Modern Woodmen, 97 Mo. App. 636; Ferbrache v. Grand Lodge, 81 Mo. App. 268; Ang. &

Ames on Corp., sec. 111; Bacon on Benefit Societies, sec. 47, p. 76. Fraternal beneficiary associations have no right to issue paid-up certificates. Westerman v. Supreme Lodge K. P., 196 Mo. 670. Section 1408, Revised Statutes 1899, the first section of the act, provides that "such associations shall be governed by this act and shall be exempt from the provisions of the insurance laws of this State, and shall not pay a corporation or other tax, and no law hereafter passed shall apply to them unless they be expressly designated therein." Under said section, fraternal associations "shall make provision for the payment of benefits in case of death, and may make provision for the payment of benefits in case of sickness, temporary or permanent physical disability either as the result of disease, accident or old age, provided the period in life at which payment of physical disability benefits on account of old age commences, shall not be under seventy years." This section is the measure of the powers of such associations, foreign or domestic, for under section 1410 a foreign corporation, in order to do business in Missouri, must come "within the description as set forth in section 1408." No section of the act authorizes the issue of benefit certificates providing that all the anticipated assessments shall be paid within the first twenty years of membership, and it is not necessary for such association to issue such certificates in exercising the powers given them. The enumeration of the powers which a corporation can exercise implies the exclusion of all others, and such acts are strictly construed and all ambiguities are resolved against the corporation. State ex inf. v. Lincoln Trust Co., 144 Mo. 562; 2 Lewis's Sutherland Stat. Const. sec. 555. Fraternal beneficiary associations are creatures of the statute, incapable of exercising any power not therein expressed or clearly implied, and an attempt to do so is *ultra*

*vires.* And it has been held that if they attempt to provide for the relief of persons not named in the statute, their acts are void; they are classified by the courts as old-line insurance companies, and the old-line insurance laws have been applied to them. Ferbrache v. Grand Lodge, 81 Mo. App. 268; Lloyd v. Modern Woodmen, 113 Mo. App. 19; Dennis v. Modern Brotherhood, 119 Mo. App. 210; Toomey v. Supreme Lodge, 147 Mo. 130; McDermott v. Modern Woodmen, 97 Mo. App. 636; Brashfield v. Modern Woodmen, 88 Mo. App. 208; Shotliff v. Modern Woodmen, 100 Mo. App. 141; Angell & Ames, Corp., sec. 256; State ex rel. v. Orear, 144 Mo. 157; Endlich on Interpretation of Statutes, sec. 360; Westerman v. Supreme Lodge K. of P., 196 Mo. 709; State ex rel. v. Job, 205 Mo. 1. (2) Fraternal beneficiary associations have no authority to grant extended insurance, or to apply to their certificates the non-forfeiture provisions contained in section 7897, Revised Statutes 1899. The plan under which they are organized does not contemplate the issuance by them of certificates containing the non-forfeiture clause. Westerman v. Supreme Lodge K. of P., 196 Mo. 670.

VALLIANT, J.—Relator is a corporation organized as a fraternal beneficiary association under laws enacted by Congress for the District of Columbia, its domicile is that District. It has in its organization an insurance department in which it insures the lives of such of its members as are eligible under its laws and as desire such insurance. It has subordinate lodges established throughout the States and Territories of the United States. The total number of members in all its lodges at the date of the institution of this proceeding was 671,162, of which 81,819 were covered by its life insurance. It has been doing a life insurance business in this State since 1877, it now has 247 lodges with 26,832 members of which 3,848 are holders of poli-

cies of life insurance, or, as they are called by relator, benefit certificates. Since the passage of the act of the General Assembly entitled, "An act defining and regulating Fraternal Beneficiary Societies," etc., Approved March 16, 1897 (Laws 1897, p. 132), the relator has received annually, until March 1, 1907, a certificate from the Superintendent of the Insurance Department authorizing it to do business as a fraternal beneficiary society in this State, but on that date, the Superintendent refused to give relator such certificate. This is an application for a writ of mandamus to compel him to do so.

The Superintendent of Insurance in his return admits that he has refused to issue the certificate as alleged and says in justification of his refusal that the relator is engaged in issuing policies of life insurance which the statute does not authorize a fraternal beneficiary society to issue.

The point in controversy is the character of the policies the relator is issuing. There is no dispute of the fact, but the question is one of law.

On January 1, 1907, relator established what it calls the fifth class of insurance, which provides four plans called Plan A, Plan B, Plan C, and Plan D. The objection of the Superintendent of Insurance is to Plans A, B and D; Plan C is not criticised. The objection made to Plan B is that a policy issued under it is a twenty-year paid-up policy, and the objection to Plans A, B and D is that a policy issued under either of them is non-forfeitable after thirty-six months payments of premiums. Of Plan B it is said that under it the relator issues twenty-year paid-up policies.

Relator, as to Plan B, says that the policy issued under it does not require all the payments to be made within twenty years, but that it provides "that the monthly assessments upon members shall be paid in the first twenty years of his membership and the assess-

ments and dues under said plans are so arranged as to permit such payments, but that said association reserves the right to levy upon all members holding certificates under Plan B, special and extra assessments and dues, if the experience and necessities of the society shall in the future require the same to be done."

Relator admits that a policy issued under Plans A, B and D, is by its terms non-forfeitable after the payment of thirty-six months premiums. Relator does not use the word "policy" or "premium" but uses instead the words "benefit certificate" and "assessments," but we treat them as meaning the same thing. But relator draws a distinction between such a policy issued by it, and one by an old-line insurance company, in this, to-wit, that a benefit certificate is issued only to a member of the fraternity who is subject to its by-laws, and it points out certain by-laws which authorize the relator to alter the assessment from time to time as it may see fit and requires an accounting every year to see if, when tested by the year's experience, the assessment is greater than it should be or less than is necessary, and if greater the surplus is distributed to the members of the class by crediting the proportionate share to the next monthly assessment, and if less the assessment may be increased. The by-laws quoted require that the amount ascertained by the accounting as a basis to determine if the assessments shall be increased or reduced, shall be sufficient to provide "for mortality, expense and reserve."

In January, 1907, when the relator established this Fifth class of insurance it adopted the American Experience Table of Mortality as the basis for its assessments, which is a higher rate than the National Fraternal Congress Table under which relator formerly did business.

The question for our consideration is: Is it lawful

for a fraternal beneficiary society to issue policies of life insurance of the kind above mentioned?

The business of life insurance is of such great importance, such great magnitude and so intricate in its operations that our General Assembly has taken it in hand and given it especially in the care and under the supervision of an officer selected for his learning in that art. When we come to the consideration of a case involved in the intricacies of that art we immediately encounter technical terms and theories which are not familiar to any but men engaged in that business and we are sometimes misled as to the meaning of those terms. We will encounter in this case some terms and theories with which we will have to be careful. Our law recognizes that the business of life insurance may be conducted by what is called old-line companies, who are in the trade for profit and who issue all kinds of legitimate policies; also what are called assessment companies who issue only a policy the payment of which is to some degree at least dependent on the collection of an assessment on persons holding similar contracts; also companies organized to do what is called insurance on the stipulated premium plan; and lastly fraternal beneficiary associations, who are authorized (Sec. 1408, R. S. 1899), "to make provision for the payment of benefits in case of death and may make provision for the payment of benefits in case of sickness," etc. "The fund from which the payment of such benefits shall be made, and the fund from which the expenses of the association shall be defrayed, shall be derived from assessments or dues collected from its members."

Whilst these different kinds of corporations are authorized to do life insurance business in this State, yet they are not placed on the same plane before the law, the burdens are heavier on one than on another, therefore the Legislature would have no right to give to each the same privilege, to confer on the fraternal

society the right to do the same character of business that is granted the old-line company, while it imposes on the old-line company, as a condition precedent to doing business, heavy duties and restrictions not imposed on the other. Life insurance is a business, whatever may be the motive of the insurer, and where two men or two concerns are licensed to do the same business everything else being equal the license cannot be given to one on easier terms than it is given to the other. But the General Assembly may give to a certain class a fairly restricted license without inpinging the constitutional demand of equality before the law. It is therefore lawful for the General Assembly to give to fraternal societies the right to "make provision for the payment of benefits in case of death" of its members. That is as far as the General Assembly has admitted these societies into the arena of life insurance. The whole extent of the authority of relator to conduct the business of life insurance is compassed within the words just quoted. Whether the relator in issuing nonforfeitable policies and twenty-year paid-up policies is keeping within that compass is the question in this case, and the answer to that question must be found, not in the character of the relator, but in the character of those policies it is issuing and to which the Superintendent of Insurance is here objecting.

The character of the relator is an essential fact to be shown in this case, because unless it is a fraternal society, as defined by the statute, it has no right to do even the limited kind of life insurance that the statute authorizes; but the fact that it does entirely fill that definition does not authorize it to go beyond the limit prescribed by the statute. If the relator while issuing only such life insurance policies as the statute authorizes and holding a license from the Insurance Department should be called into court to answer by what authority it is issuing such policies it would be suffi-

·cient to say: We are a fraternal society, with our lodge system, our ritual, our representative form of government and we are not doing this for profit. But if it is issuing policies of a character not authorized by the statute, then its fraternal character, its lodge system, its ritual, its form of government, and its no-profit plan, would be no answer or justification of its conduct.

In Toomey v. Supreme Lodge, 147 Mo. 129, it was held that the defense of suicide was unavailing because, although the defendant was a fraternal beneficiary society, yet the policy sued on was an old-line policy of life insurance and therefore subject to the general statute, and the defendant was liable as an old-line company would be.

In Aloe v. Fidelity M. Life Assn., 164 Mo. 675, it was held that although the defendant was chartered to do business only on the assessment plan, yet the policy it had issued in that case was not on that plan but an old-line policy and therefore the defendant was held liable as an old-line company. Other cases to the same effect are referred to in the opinions in those cases.

There is no gainsaying that the relator is a fraternal society possessing all the qualifications prescribed by the statute, but those qualifications do not justify its issuing policies that only old-line companies may issue. In Westerman v. Supreme Lodge Knights of Pythias, 196 Mo. 670, the plaintiff was endeavoring to hold the defendant liable on a policy on which more than three years' premiums had been paid, but on which there had been default in the other payments, under the provisions of section 5856, Revised Statutes 1889; providing that after the payment of three years' premiums the policy should be non-forfeitable, but this ·court held the character of the business of life insurance that the defendant was conducting was inconsis-

tent with the theory on which the statute based the non-forfeitable feature of policies of life insurance, therefore the defendant was not liable in that case. Now the defendant in that case is the relator here asking that the Superintendent of Insurance be required to give it a license to issue policies of that kind and in justification of its present act it says that the statute, under which it was acting when the contract was made, out of which the Westerman case arose, has since been amended and that relator's rights in this respect enlarged.

If the relator has the right to issue the policies it now claims to have there is little if any limit to its field of operation in the business of life insurance; it may compete with the old-line companies without the supervision and insight into its affairs that the old-line companies must submit to, and without the payment of two per cent of its earnings, as a tax, into the State treasury. But the relator says there is this great difference between it and the old-line companies, it says in effect: we have our lodges, our ritual, our republican form of government and we aim to make no profit. There is the social side and there is the business side of fraternal beneficiary societies; the lodge and the ritual and the representative form of its government are features appertaining more to the social side, while the issuing of policies and the collecting of premiums relate to the business side. The law regards with favor the fraternal or social feature of such organizations and it is because of its trust in their moral effect as fraternal societies that the law has given them the authority to transact this business; but after all that is considered, when the society goes into business, its rights and duties must be considered from a business, rather than a sentimental standpoint. The relator says: Our business differs from that of an old-line company in this, to-wit, we insure only the mem-

bers of the fraternity in good standing and insure them only for the benefit of members of their families or their dependents. There is that difference, but that is one of the limits the statute puts on the society; it has not granted it the right to insure one who is not under the moral restraint which it is presumed the social communion imposes, nor will the law allow it to insure a member for the benefit of his creditors, but all that has nothing to do with the form of the contract of insurance, it does not authorize the society to issue a policy different in character from that which it is otherwise not authorized to issue. And relator says there is also this wide difference between the business it conducts and that conducted by the old-line companies, to-wit, We aim in our business to make no profit; if at the end of the year we find that we have collected more than enough to pay our death losses, our expenses and to lay by a reserve, we distribute that surplus among the members of the class by giving them credit on their incoming assessments. That course of business differs only in form and name from that of a purely mutual old-line life insurance company. There is no profit to all the members of the Supreme Lodge Knights of Pythias, but there is a profit to all the members in that class of insured, the profit is in getting the insurance at the actual cost, and if, by accounting, it is ascertained that the cost has been less than the premiums paid the surplus is paid back to them, whether it is paid in cash or credited on their future maturing obligations it is the same, and it is the same as that which in purely mutual insurance companies is called dividends. Relator also says that there is still this other difference between the contracts evidenced by its policies and those of the old-line companies, that is, if the premiums collected are not sufficient to meet the ends for which they were assessed the relator has the right to levy an additional assessment on the members.

But that is a mere empty form. When the relator set out to enlarge its power as a life insurance company by issuing twenty-year paid-up policies, and policies non-forfeitable after payment for three years of premiums, like the old-line companies were doing, it abandoned the National Fraternal Congress Table of Mortality on which it had theretofore made its calculations, and adopted the American Experience Tables which call for higher premiums, and which is the basis of the calculations of the old-line companies. There is nothing in the future that can be estimated with more accuracy than the death rate as shown by the American Experience Table and, therefore, when the relator collects its premiums calculated on that table, it is as sure as any forecast can be that it will be sufficient for the purpose. The possibility of the arising of an occasion to put into effect the reserved power to levy another assessment is so remote that no effect should be given to it. By the use of the American Experience Tables the old-line companies calculate the amounts that will be necessary for them to collect in the way of premiums to provide, not only a fund out of which to pay the death losses that are sure to come, but also to accumlate a reserve fund a part of which the law requires them to apply to extended insurance in case of default in payment of premiums after three years. Experience has shown that these calculations never fail; they have never failed the old-line companies and it is altogether improbable that they will fail the relator. Therefore the right given by the by-laws to levy extra assessments is of no consequence.

In the Westerman case, above referred to, it was held that there could be no such thing as a paid-up policy issued by a fraternal society. If such a society cannot issue a policy paid-up at the date of its issuance, neither can it issue one paid up at a definite date. If it may issue a policy to be paid-up in twenty years,

so it may one to be paid in ten, or five or one year; the power to issue the one is the essence of the power to issue the other.

But the relator says, Our by-laws allow us to change all this, we need not adhere to the rates now fixed, we may change them, therefore there is no fixed and unalterable contract for a twenty-year paid-up policy. Granting for the sake of the argument that that is so, still the relator is claiming the right to do now that which will result in the issuance of such a policy, and if that right is granted the relator may do that business until it pleases to do otherwise.

The relator's by-law which it quotes as showing how the accounting is had at the end of each year to ascertain if too much has been collected, and, if so, to distribute the surplus in the way of credits on the accruing premiums, provides that before any surplus is declared the sum collected must be sufficient to meet death losses, and the "expense, and reserve required upon the insurance quoted in said fifth class." That is exactly what the law requires the old-line companies to do and it is what this court decided in the Westerman case this relator could not do.

But it is said in the brief of relator: "The question in the Westerman case involved the construction of the Act of March 8th, 1879, which was passed when fraternal beneficiary associations were conducting their business upon the *post mortem* plan, which was that at the death of a member, assessments were levied upon the other members to pay his beneficiaries the money to which they were entitled." The counsel now contend that that was all changed by the Act of 1897. The policy in the Westerman case was issued in 1883, the insured member died in 1900, therefore the statute as it was in 1879 was the law of the case, but the whole trend of argument in the opinion in that case was to the effect that the non-forfeiture statute under which

the plaintiff was attempting to hold the defendant liable was inapplicable, because contrary to the nature of the business of life insurance as a fraternal society was allowed to conduct it, and that too was the theory on which counsel for defendant pressed the argument, and although that case was heard in 1906 when the present statute had been for many years on the books yet no distinction between it and the Act of March 8, 1879, was noticed. The defendant then insisted in its brief that it was not authorized by its charter to issue a policy that would be non-forfeitable, as required by section 5856, Revised Statutes 1889.

Let us see what changes have been made in the statute that have conferred authority on fraternal societies to do a life insurance business since the date of the issuance of the policy in the Westerman case. That policy was issued, as has already been said, in 1883.

March 8, 1879, the General Assembly passed an act by which a new section was added to the General Statutes of 1872, relating to benevolent, religious and educational associations as follows: "Sec. 14. The associations and societies of the character referred to and mentioned in the first section of this act, may also include in their corporate powers the privilege for providing for the relief and aid of the families, widows, orphans or other dependents of their deceased members, or for assisting such as may be sick or disabled, from the proceeds of assessments upon the members of such society or association." That is the initial statute on this subject in this State. Section 15 of that act authorized such societies already existing to avail themselves of the right conferred in section 14, and declared all such societies exempt from the operation of the general statutes in regard to insurance companies. [Laws 1879, p. 65.] Afterwards, during the same session, the General Assembly passed another act on the

same subject, approved May 19, 1879, which conferred in substantially the same words as those used in the Act of March 8th the power on benevolent, religious and educational associations to provide means wherewith to assist its sick and disabled members, orphans or other dependents of its members who may die, without being therefor subjected to the operation of the general statutes of this State relating to life insurance; "*Provided*, that nothing herein contained shall be construed to authorize any association formed hereunder to insure the life of any member thereof for his own benefit or that of any other person." [Laws 1879, p. 67.]

In 1880, in the case of State ex rel. v. Merchants' Exchange Mutual Ben. Society, 72 Mo. 146, the court construed the *proviso* just quoted as forbidding such societies to issue benefit certificates on the lives of its members. By force of that decision no society had authority to issue a benefit certificate such as it had been issuing payable out of money collected on assessments of its members. But at the next session of the General Assembly that proviso was repealed, by an act approved February 8th, 1881 (Laws 1881, p. 86). And afterwards, at the same session, an act was passed, approved March 8th, 1881 (Laws 1881, p. 87), the first section of which is as follows:

"Section 1. No benevolent or charitable association or society now incorporated or that may hereafter be incorporated under the laws of this State, or of any other State or Territory of the United States, which shall issue any certificate to or make any promise or agreement with its members, whereby any sum of money or benefit is to become due or payable to its sick or disabled members, or on the decease of a member, solely from the proceeds of assessment or dues collected from the members thereof, shall be deemed

an insurance company, or subject to the general insurance laws of this State."

The law was revised in 1889 and became section 2823, Revised Statutes 1889, as follows:

"Fraternal-beneficial societies may provide for the relief and aid of their members and families, widows, orphans or other kindred dependents of deceased members, or for assisting such as may be sick or disabled, from the proceeds of assessments upon the members of such society or association; and to that end may issue to its members beneficial certificates, payable at such time and in such manner as shall be therein provided, and do such other things as shall be provided by the laws of the State; and such fraternal-beneficial societies shall not in any way be subject to the insurance laws of the State, nor under the control or supervision of the insurance department of the State, nor pay any corporation or other tax: *Provided*, that any beneficiary in a certificate issued by any such association may pay the dues and assessments charged against such member on account of his membership."

Prior to the passage of the Act of 1897, which is now section 1408, Revised Statutes 1899, all the authority that these societies possessed to do a life insurance business was to be found in the two acts of 1879, the two acts of 1881 and the revision of 1889 above mentioned.

In 1897 was passed the statute under which relator claims the right it is here asserting, which is now section 1408, Revised Statutes 1899, as follows:

"A fraternal beneficiary association is hereby declared to be a corporation, society or voluntary association, formed or organized and carried on for the sole benefit of its members and their beneficiaries, and not for profit. Each association shall have a lodge system, with ritualistic form of work and representative form of government, and shall make provision for

the payment of benefits in case of death, and may make provision for the payment of benefits in case of sickness, temporary or permanent physical disability, either as the result of disease, accident or old age, provided the period in life at which payment of physical disability benefits on account of old age commences, shall not be under seventy years, subject to their compliance with its constitution and laws. The fund from which the payment of such benefits shall be made, and the fund from which the expenses of such association shall be defrayed, shall be derived from assessments or dues collected from its members. Payments of death benefits shall be to the families, heirs, blood relatives, affianced husband or affianced wife of, or to persons dependent upon the members. Such associations shall be governed by this act and shall be exempt from the provisions of the insurance laws of this State, and shall not pay a corporation or other tax, and no law hereafter passed shall apply to them unless they be expressly designated therein. And such fraternal beneficial association may create, maintain, disburse and apply a reserve or emergency fund in accordance with its constitution or by-laws.''

Section 1410 authorizes fraternal corporations organized in other states and territories to do a like business here and prescribes the terms of their admission. Section 1411 requires such societies to make annual reports to the Superintendent of Insurance and outlines what the reports shall show.

Morton v. Royal Tribe, etc., 93 Mo. App. 78, was a suit on a beneficiary certificate issued by a fraternal society and the defense was that the member had committed suicide, which by the terms of the contract rendered the insurance void. The court compared the statute of March 8th, 1879, with the Act of 1897 above quoted, and reached the conclusion that the latter act extended the power of the society, in this, to-wit, that

whereas by the Act of 1879 the fund out of which the insurance was to be paid was limited to "proceeds of assessments upon the members of such society or association," the Act of 1897 authorized the society to raise the fund by dues or assessments or both. And in Tice v. Knights of Pythias, 123 Mo. App. 85, l. c. 103, the same idea prevailed; the court in that case said: "But the present statutes, instead of restricting the association to that means of raising the fund, expressly authorize it to be raised by dues collected from members as well as by assessments, and impliedly authorize its obtainment from still other sources; for among the questions fraternal-beneficiary associations are requir ed to answer in their annual reports to the Superintendent of Insurance is this one: 'Does association guarantee in its certificates *fixed amounts to be paid, regardless of the amount realized from assessments, dues, admission fees and donations?'* "

It was said in the case last cited that when fraternal societies first began to issue these benefit certificates the plan was to levy an assessment on the members when the insured member died and the amount paid the beneficiary was limited to the sum collected on that assessment and that that was the idea in our first statute; it is called in the brief of relator in this case the *post-mortem* assessment plan. But it is said by relator that this character of insurance has developed so that now there are *ante-mortem* assessments by which the fund is collected and held ready for the payment of the death loss when death occurs. That is perhaps correct history of the development of the custom of paying death benefits by fraternal societies, but history also tells us that fraternal societies existed long before 1879 when our first statute on this subject was enacted, and the benefits they extended to the needy families of their  deceased members  were governed alone by their own by-laws, and it was doubtless then

that what counsel call *post-mortem* assessments were resorted to. If *post-mortem* assessments were ever the rule after the passage of the Act of 1879 the record before us does not show it. But however that may be, the change from *post-mortem* to *ante-mortem* assessments did not wait on the amendment of the statute but it was in vogue long before the Act of 1897 was passed. Neither the law of 1879 nor that of 1897 has anything to say about *post-mortem* or *ante-mortem* assessments, they say that the fund to pay the death-loss is to be raised by assessments on the members. Such societies soon learned by experience that in time death would surely mature the obligation of the benefit certificate, and the mortuary tables told them when to expect it. Therefore the change from *post-mortem* to *ante-mortem* assessments was only a change in business methods and did not require a change in the statute to authorize it. The language of the Act of 1879 itself shows that it contemplated *ante-mortem* assessments to meet the expected death losses; the language is, "may also include in their corporate powers the privilege of providing for the relief" etc. The definition of the word provide in Webster is: "To look out for in advance; to procure beforehand; to get, collect or make ready for future use."

Returning now to what was said, as above quoted, in the Tice case as to the extension of the sources of revenue to furnish the money needed to pay their beneficiary certificates: The Act of 1879 says it is to come from "the proceeds of assessments upon the members." The Act of 1897 says: "The fund from which such benefits shall be made, and the fund from which the expense of such association shall be defrayed, shall be derived from assessments or dues collected from the members." The word "assessments" and the word "dues" are used there without definition and seeming-

213 Sup—14

ly as meaning the same thing. Webster says the conjunction or is often placed between "different terms expressing the same thing or idea; as this is a sphere *or* globe."

The word "dues" in that connection was not for the first time used in the Act of 1897, but it occurs in the same sense in the Act of 1881 above quoted where the language is: "From the proceeds of assessment or dues collected from the members thereof."

We have had sufficient to do with the by-laws of societies of this kind to know that they have what they call "dues" which are the sums paid by the members towards the support of the society, they are called lodge dues, council dues, chapter dues, tent dues, etc., etc., according to the nomenclature of the different societies. One must pay his dues to retain his social membership in the society. The relator has a membership of 671,162, all of whom doubtless (with exceptions for cause) pay their membership dues, whereas only 81,819 members hold benefit certificates and these must pay the premiums on those certificates or policies. In that respect also we find a difference in the names used by the different societies to express the periodical sum that is to be paid to carry that insurance, they all seem of one mind on one point only in this respect, that is, they all avoid the word premium; one will call it an assessment, another a contribution, another an installment and perhaps some in that connection call it dues, but they all mean the price paid for the insurance. The word "dues" in this connection has no particularly technical meaning and therefore we cannot assume that the General Assembly intended to use it in any technical sense that would confer an additional franchise on the corporation. Think of the significance that it is attempted to give to that word "dues" in the connection in which it is there used; it is no less than that it conferred by implication on fraternal societies the

corporate power to issue policies of life insurance which before they had no authority to issue. If it was unlawful before the Act of 1897 for fraternal societies to issue such policies can we imagine that the General Assembly intended to confer that important power otherwise than in plain and unambiguous words?

The Tice case came to this court and we reached the same conclusion that the St. Louis Court of Appeals had reached, but we followed a somewhat different line of thought. The Westerman case was then fresh in our minds and we construed it as settling the law for the Tice case, although the policy in the one was issued before and that in the other after the Act of 1897 was the law. In the Westerman case it was held that the non-forfeiture statute did not apply to the beneficiary certificate in question because the defendant was a fraternal society, not an old-line life insurance company, and that in issuing certificates of the kind then in suit it was not issuing policies of the kind contemplated by the non-forfeiture statute; that it was keeping within the circumscribed limits of a fraternal beneficiary society and therefore it was exempt from the general insurance laws, exempt in that case from the non-forfeiture statute and exempt in the Tice case from the suicide statute. The defendant is now asking to be allowed to do the very things for the not doing of which in those cases it claimed it was exempt from the burdens imposed on the regular insurance companies. Can it be possible the Legislature intended to confer on them the right to do the same kind of business the regular companies were doing, yet still exempt them from the supervision of the Superintendent of Insurance, from official insight into their business, to require no deposit as security for their policy-holders, and pay no tax into the State Treasury?

But there is another word in the Act of 1897 to which relator attaches important significance; it is the

word "reserve" in the closing sentence of section 1408.

The closing sentence of section 1408 is: "And such fraternal beneficial association may create, maintain, disburse and apply a reserve or emergency fund in accordance with its constitution or by-laws." Relator thinks that that sentence confers on fraternal societies the corporate power to issue life insurance policies of the twenty-year paid-up kind, and of the non-forfeitable kind.

Comparing the Act of 1897 (Sec. 1408) with that of 1879, the only differences between the two, so far as the grant of authority to insure the lives of its members is concerned, are that in the Act of 1879 it is prescribed that the benefits are to be paid "from the proceeds of assessments upon the members of such society or association," whereas in the Act of 1897 it says: "from dues or assessments collected from its members," and in authorizing the society to create a "reserve or emergency fund." All else in the Act of 1897 that is new, is the definition of a fraternal society. It is conceded that prior to the Act of 1897 the relator had no right to issue such policies as it now claims the right to issue, therefore if the authority was conferred by that act it must be found in the words "dues" and "reserve fund."

If relator was a life insurance company organized for the purpose and with the power to do a general life insurance business, incidental grants of authority in its charter would naturally be construed as designed to carry out the object of its existence. But relator is not a life insurance corporation, the insuring of the lives of its members is not the object of its existence, such is merely an incidental and comparatively unimportant feature; its only natural purposes are those that pertain to its moral and social character, therefore it has no corporate power to insure the lives of its

members except by express grant or a grant appearing by necessary implication.

We have already above discussed the word "dues" in the connection in which it is used in the statute and were unable to find any significance in it to favor the relator's claim; now let us see what force there is in the word "reserve" as it is used in the sentence above quoted. The argument seems to be that because the statute confers the power to create a reserve fund it confers by implication the power to issue any kind of policies to which a reserve fund may be applied. The language of the statute is "reserve or emergency fund," and of this the relator says the words "reserve" and "emergency" are not convertible terms. In their ordinary, as distinguished from their technical, meaning the words "reserve" and "emergency" are sometimes appropriately used interchangeably to express the same thought, but the relator argues that the word "reserve" is here used in its technical sense.

The word "reserve" in connection with the subject of life insurance, has a technical meaning, but if the writer of the statute intended to use it in that sense he made an awkward connection when he yoked it with the word "emergency" which has no such technical meaning. The two words, connected as they are, "reserve or emergency fund," are susceptible only of one of two constructions, to-wit, that they were used as convertible terms or else that they were used in the alternative.

But assuming that the term reserve fund was there used in the technical sense it falls far short of conferring, as by necessary implication, the power to issue the policies in question. What is known in the language of life insurance as the "reserve" existed long before either by contract or by statute any part of it was devoted to extended insurance. In 7 Words and

Phrases, p. 6147, the term "reserve fund" is thus defined: "When the term is applied to a level-rate policy, it means a sufficient percentum of the annual premiums to meet, when invested at a given rate of interest, all present and prospective liability on account of the particular policy. When applied to term insurance, it means the entire mortuary premiums collected for the particular term. It has no application to assessment insurance."

There is a plan of insurance in which the premiums increase yearly as the insured grows older, this is called the step-rate plan. There is also what is called the level-rate plan, in which the premiums remain the same during the life of the insured, but in that plan the insured pays more in the beginning than he would pay in the step-rate plan, more than the cost of the insurance at that age, but that additional sum is paid at that age to compensate the insurer for carrying the risk after the insured has grown older and has reached an age when the annual premium is less than the costs of the insurance. The calculations are made for both plans on the same basis, so that two men of the same age taking each a policy at the same time, one in the step-rate and the other in the level-rate plan, both living out the period of their estimated life expectancy, would each pay, in the aggregate, the same sum in premiums. But during those years in which the man holding the level-rate policy was paying more than would have been required of him if his policy had been such as called for premiums increasing as his age increased, there was laying up in the treasury of the company to the credit of his policy a sum of money that was called the reserve. If in that condition the policy-holder should cease paying the premiums, if there was no statute to control otherwise, the policy would lapse, and the reserve in the hands of the company would be the company's gain. But after awhile many of the companies

by contract, in advance, agreed to apply part of that reserve to the payment of extended insurance. In this State our statute requires that to be done. [Sec. 7897, R. S. 1899.] In the Westerman case the beneficiary in the policy sued on invoked that statute and endeavored to have its requirements applied to that policy or benefit certificate, but the defendant in that case, the relator here, insisted that the statute did not apply and could not apply because the system on which it was conducting business accumulated no reserve and that it was foreign to its nature to do business on a system that did accumulate such a fund.

The Act of March 8, 1879, which was the first statute that authorized benefit certificates to be issued payable out of assessments on the members, did not prescribe the tables on which the assessments should be calculated, or limit the amount of the assessments, therefore if the society had chosen to do so it could have made the assessments large enough to have created a reserve fund even before the Act of 1897 was passed. The theory of the defendant in the Westerman case was not that it was so limited by statute in the amount of the assessments it might levy that it could not create a reserve, but that in point of fact it was not doing business in that way. The Act of 1897 gave express power to create a "reserve or emergency fund," but, as the learned counsel for relator in their brief well say, "It was not a compulsory provision. It was purely permissive." If that is so then it granted no new power and imposed no new obligation.

The language of the statute on this point is peculiar. It authorizes, but does not require, the creation of a "reserve or emergency fund," and authorizes the society to disburse the same "in accordance with its constitution and by-laws." That is to say, that whilst the regular life insurance companies are required to apply a certain portion of their reserve fund to ex-

tended insurance, the fraternal societies may dispose of their reserve in any manner they see fit.

What is known as the "reserve" in its technical sense was not, in its origin, designed to be applied to extended insurance after default in payment of premiums, that is a comparatively new use to which it is in part now applied, either by contract or by force of the statute; therefore authority to create a reserve fund does not necessarily carry the authority to issue a kind of policy which the society could not otherwise issue. When the Legislature said to the fraternal societies, You may raise a reserve fund, it did not necessarily mean to say that they might issue non-forfeitable policies, and since a grant of such power to a fraternal society to do a life insurance business must be either in express terms or in terms necessarily so implying, there is no such grant contained in the mere grant of power to raise a reserve.

In what we have just above said we have assumed, as counsel for relator contend, that in the use of the term "reserve fund" the Legislature had in mind that which is called the reserve in its strict technical sense of life insurance, but the context shows that that is not the sense in which it was used. The term is "reserve or emergency fund." The words "reserve" and "emergency" are there both used as adjectives qualifying the same noun, and, as such, are convertible terms. Such is the natural interpretation of the words, and when so interpreted they are in entire harmony with the character of fraternal beneficiary societies. The theory of fraternal beneficiary insurance, as expounded in the Westerman case, is to furnish the insurance at the least possible cost, it is not to heap up riches in the treasury of the society; therefore a doubt might have arisen in the minds of some of the society members if it was lawful to collect any more than just enough to pay the cost of the insurance, or to make

provision for an emergency that might in the future arise. This clause removes that doubt, it was intended to enable the society to lay up a reasonable fund to meet an unusual emergency. Some of these societies are not as large as the relator, they are of limited field and they may well anticipate that an unusual occurrence might render them unable to meet the death losses and therefore they may provide in advance and hold in reserve a fund to meet such emergency. That is what that clause in section 1408 means.

If fraternal societies have authority to issue twenty-year-paid-up policies and policies non-forfeitable, there is no reason why they may not issue any kind of life insurance policies that a regular life insurance company may issue, and, if so, then they are in the arena of life insurance as competitors of the old-line companies with none of the restrictions that come from supervision of the Insurance Department and investigation of their affairs, none of the deposits that the law requires of the old-line companies for security for policy-holders, and no obligation to pay the tax of two per cent per annum on premiums. A statute conferring such authority would not only be vicious class legislation, but it would sanction a course of business obnoxious to the public policy of the State in reference to life insurance, as set forth in our general statutes on that subject.

The Superintendent of Insurance was right in refusing to grant relator a license under the facts stated in the petition. The writ is denied.

All concur.