MAGGIE CONNER, Respondent, v. THE LIFE & ANNUITY ASSOCIATION, Appellant.

Kansas City Court of Appeals, June 2, 1913.

1. FRATERNAL BENEFICIARY ASSOCIATIONS: Warranties: Fraudulent Representations. The question of false and fraudulent representations in securing an insurance policy, in an action to recover the amount of the death claim, is one of fact to be determined by the jury.

2. ————: Foreign Society: Evidence. Where a fraternal beneficiary society incorporated in another State fails to prove that, at the time the policy, upon which suit is brought, was issued, it was authorized to do business in this State as a fraternal beneficiary society, the laws pertaining to old line life insurance govern the action.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn*, Judge.

AFFIRMED.

*Metcalf, Brady & Sherman* for appellant.

*E. W. Taylor* and *Charles Brown* for respondent.

JOHNSON, J.—This is an action on a policy of life insurance, dated December 6, 1910, and delivered to Harry Conner, the assured, December 17, 1910. Conner was twenty-one years of age, unmarried and plaintiff, his mother, was made his beneficiary. He died at his mother's home in Kansas City, December 29, 1910, twelve days after the delivery of the policy to him. The answer alleges that defendant is a fraternal beneficiary society, incorporated in the State of Kansas and licensed to do business in this State, but defendant failed to prove that at the time the policy was issued it was authorized to do business in this State as a fraternal beneficiary society and the court properly treated the action as being founded on

an ordinary policy of life insurance. [Gruwell v. Knights & Ladies of Security, 126 Mo. App. 496; Newland v. Modern Woodmen, 153 S. W. Rep. 1097; 168 Mo. App. 311; State ex rel. v. Vandiver, 213 Mo. 187; Schmidt v. Foresters, 228 Mo. 675.]

The principal defense is that Conner made false and fraudulent representations in obtaining the policy and that the matter thus misrepresented "actually contributed to the contingency or event on which the policy became due and payable" within the statutory meaning of that term. [Sec. 6937, Rev. Stat. 1909.]

The alleged false statements are found in the written application signed by Connor which, by the terms of the policy, was made a part of the contract. In the application which was signed and delivered November 30, 1910, Conner stated that he was in sound health, had no disease that would tend to shorten his life, had not suffered from spitting or coughing blood or from any chest or lung disease, and never had been "under treatment at any asylum, cure or sanitarium." Further he stated that his name was Harry Conner, that his father was forty-two years old and in good health, and that he had one sister who was twenty-four years old and in good health. The young man's real name was Harry Williams and his father had been dead thirteen years, his stepfather's name was Conner and he had adopted and had been known by that name. His only sister would have been twenty-four years old had she been living but she had been dead five or six years.

Defendant introduced evidence tending to show that at the times of his application and of the delivery of the policy Conner was in an advanced stage of pulmonary tuberculosis and knew that the statements relating to his health which we have quoted were untrue. He was confined at home by the disease for ten days preceding his death and the attending physician who was called in a week before he died testified that

he died of tuberculosis of the lungs. On March 1, 1910, he was admitted to the "Volker Pavilion" in Kansas City, a charitable institution for the treatment of sufferers from tuberculosis, and remained there three months under the care of the physician in charge who testified that "when he came there he had been losing weight; he had some hemorrhages and he had a very bad cough. While he was there he put on several pounds. I think he went up from about 111 pounds to 120 pounds, and he had a decrease in the number of hemorrhages that he had, and a decrease in his cough." The witness diagnosed the case as one of pulmonary tuberculosis that had reached an incurable stage.

On the other hand the report by defendant's examining physician of an examination of the applicant on November 30, 1910, contains these statements: "Actual weight 135 lbs. Height 5f. 7 in. . . . Q. If over or under weight, is it a family characteristic? A. Yes. Q. Does he appear careworn or older than age stated? A. No."

"Girth of chest (under vest) deep expiration 28 inches; full inspiration 31 inches; girth of abdomen at waist line 29 inches. Q. Is his appearance healthy? A. Yes. Figure? Fine." . . . Lungs. Q. Is the respiratory murmer clear and distinct over both lungs? Yes. Is the respiration full, easy and regular? Yes. Number per minute? 19. Do you find any indication of disease of the lungs, throat or bronchial tubes? No. . . . Do you find anything unfavorable in the applicant's physique, occupation, habits or circumstances of life? No. Do you consider the risk first class, or good, or only fair? First class."

Plaintiff testified that the father of the assured died of dropsy and his sister of "the grippe;" that she did not know the cause of her son's death, and that before that event she had no information or knowledge that he had tuberculosis. She denied positively

that he had hemorrhages or ever coughed or spat blood. She stated that prior to his last illness, which lasted about ten days "he was a stout, healthy enough looking boy" and generally weighed about one hundred and thirty or one hundred and forty pounds. We quote from her testimony: "Q. And had Harry always lived with you during his life? A. Yes, sir. Q. Had he ever had any serious illness or disease of any kind? A. No, sir. Q. There has been—I think you heard Dr. Clendenning telling about Harry's being out there at the Volker pavilion, here in Kansas City. What do you know about his going out there? How did that happen? A. Harry had kind of run down and he went out there for the outdoor air and diet treatment. Q. Before he went out there had he any doctor? A. He had not. Q. How did he happen to try that plan? How did he happen to go out there? A. He did, too—a little bit the doctor treated him, just for a short time, and he advised me to send him out there. . . . Q. (By Mr. Taylor): You say he went out to this Volker pavilion? A. Yes, sir. Q. How often did he come home to see you? A. As much as once a week and sometimes oftener. Q. Did you occasionally go out there to see him? A. Yes, sir. Q. What effect did the rest out there seem to have on him? A. It seemed to help him. He kept quieter, and gained in flesh."

Young Conner worked as a clerk in a grocery store and a pool hall attendant until ten days before his death. The proprietor of the pool hall stated that he saw Conner five or six hours every day, that he appeared to be in good health, had never coughed or spat blood or had hemorrhages and exhibited no indications of consumption or impaired health.

The court overruled the demurrer to the evidence offered by defendant and gave the following instruction at the request of plaintiff: "The court instructs the jury that it is a question for the jury to determine

whether or not Harry Conner made any misrepresentation to the defendant in obtaining or securing the policy of insurance on his life, sued on in this case, and it is also a question for the jury, if you find that any misrepresentation was made, to determine whether or not the matter misrepresented, if you so find, actually contributed to his death. And unless you shall find that Harry Conner did make misrepresentation in obtaining or securing the policy of insurance on his life, sued on in this case, and unless the matter misrepresented shall have actually contributed to his death, then your verdict must be for the plaintiff.''

The jury returned a verdict for plaintiff and after its motions for a new trial and in arrest of judgment were overruled, defendant appealed.

Section 6937, Rev. Stat. 1909, provides: ''No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this State, shall be deemed material, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed in any case shall be a question for the jury.''

Counsel for defendant argue that this statute does not apply ''to a willfully fraudulent misrepresentation. The law recognizes a distinction between a misrepresentation and a fraudulent misrepresentation and does not apply to a case where misrepresentations were knowingly false and made with a view to deceive or mislead the company.''

We so decided in Ashford v. Ins. Co., 80 Mo. App. 638 and in Van Cleave v. Casualty Co., 82 Mo. App. 668, where we held that insurance obtained by any fraud remediable at law or in equity may be avoided on a proper showing of the fraud and that the statute on representations does not preclude the defense of fraud in obtaining a policy. But those cases on which

much stress is laid by defendant were expressly overruled by the Supreme Court in Kern v. Legion of Honor, 167 Mo. 471, and the statute was interpreted as intending to ignore all distinctions between innocent and fraudulent misrepresentations in applications for insurance policies and of making a jury question of every issue of misrepresentation and of the effect thereof on the ''contingency or event on which the policy is to become due and payable.'' During the life of the insured but not afterwards the company may sue to set aside a policy on the ground that it was procured by fraud.

This statute applies to the case in hand. [Gruwell v. Knights, etc., supra; Newland v. Modern Woodmen, supra; Schuermann v. Ins. Co., 165 Mo. 641; Kern v. Legion of Honor, supra.] And the question presented for our determination by the demurrer to the evidence is whether or not we should declare as a matter of law, first, that misrepresentations as to material facts appear in the application and, second, that they actually contributed to the event on which the policy became payable. The statute expressly provides that such questions are for the jury to determine. As is said by the Supreme Court in Keller v. Ins. Co., 198 Mo. l. c. 463: ''. . . the question of false and fraudulent representations in securing such policy in an action to recover the amount of the death claim, must be governed by the provisions of section 7890, and as to whether the misrepresented matters in the application for insurance contributed to the happening of the contingency insured against, are questions of fact to be determined by the jury to whom such facts are submitted.''

In Benson v. Insurance Co., 161 Mo. App. 480, we held that the evidence showed in law ''that deceased died of the disease misrepresented,'' but that ruling was based on uncontradicted evidence so clear and in-

disputable that no reasonable mind could doubt it. Where there is any room at all in the evidence for a reasonable difference of opinion about either of these issues the statute intends that the question shall go to the jury as one of fact.

The proof of misrepresentations as to matters of family history is clear and indisputable but those facts do not appear to have had any connection with the event which created a liability under the policy and therefore may be passed with the observation that they have nothing to do with the case. The proof, offered by defendant to the effect that the applicant died of tuberculosis and was afflicted with that disease at the time he signed the application and, therefore, was not in sound health when he received the policy, is strong, but by no means conclusive. Defendant's regular examining physician made a thorough examination of the young man and found no traces of a disease, the presence of which, especially in its last stages is not difficult to discover. Such evidence certainly is strong enough to raise an issue of fact with the testimony of the physicians who were introduced as witnesses by defendant. Opinion evidence is only advisory and should not be given conclusive weight especially in instances where it is contradicted by other evidence. The testimony of persons who associated with Conner daily should not be cast aside as wholly devoid of evidentiary strength and, if accepted, it tends to show that Conner did not die of tuberculosis nor have that disease.

We, therefore, conclude that the issues of the cause of his death and of the relation of the alleged misrepresented facts to that cause were issues for the jury to solve. We may concede a misrepresentation as to the fact of the applicant having been under treatment in "an asylum, cure or sanitarium" but the facts of whether he had consumption while there, was treated for that disease, or merely took a rest and

diet treatment for his general health, or was treated for a disease that contributed to his death, are matters of dispute in the evidence that, under the statute, were questions for the jury. The court committed no error in overruling the demurrer to the evidence and correctly defined the jury issues in the instruction we have quoted.

The judgment is affirmed. All concur.