## INTER-SOUTHERN LIFE INS. CO. v. ZERRELL.

### No. 9323.

Circuit Court of Appeals, Eighth Circuit.
April 30, 1932.

Arthur L. Adams, of Jonesboro, Ark. (N. F. Lamb, of Jonesboro, Ark., on the brief), for appellant.

W. A. Leach, of Stuttgart, Ark. (M. F. Elms, of Stuttgart, Ark., on the brief), for appellee.

Before VAN VALKENBURGH and SANBORN, Circuit Judges, and DAVIS, District Judge.

SANBORN, Circuit Judge.

This is an appeal from a judgment in favor of the appellee, who was the beneficiary named in a $5,000 policy issued by the appellant upon the life of her husband, Adolph E. Zerrell. The case was tried to the court without a jury. The policy was dated May 27, 1918. The insured secured a policy loan of $260 on July 28, 1922, which was never paid. Premiums and interest were paid up to November 27, 1924. The insured was then 32 years of age. He died February 15, 1930. The action was brought upon the theory that, under the terms of the policy, the insurance was automatically extended beyond the date of death. The only question in the case is, What amount was available for the purchase of extended insurance on November 27, 1924, at the time of default in the payment of premiums?

The policy was an Arkansas contract, and it is conceded that there was no statutory requirement that the insured have the benefit of the entire reserve in case of default in the payment of premiums. Therefore the amount available for the purchase of extended insurance depends upon the terms of the policy.

The policy provision relating to extended insurance in case of lapse reads as follows: "Non-Forfeiture. If the insured shall fail to pay any premium or any indebtedness hereunder when due, or within the period of grace, if any, and shall not have exercised any of the foregoing options, the company, subject to the other conditions of the policy, shall grant the extended insurance hereinbefore provided."

The options referred to in this clause, which appear under the heading "Options on Surrender or Lapse," gave to the insured, during the grace period after default in the payment of premiums and in case there was no indebtedness to the company, the right to surrender the policy and to take extended or paid-up insurance or the cash value of the policy. These options are set forth in paragraph 1 of "Options on Surrender or Lapse." The last sentence of that paragraph is: "The periods for which the insurance shall be extended and the amounts of paid-up insurance are set out in the table of loan and surrender values, and the cash value at the end of any year is the same as the loan value at the end of the preceding year."

Paragraph 2, which follows immediately after, provides that, in case there is indebtedness to the company, the insured shall have the same options, except that the indebtedness shall first be deducted from the amount which would otherwise be available as a cash value, and that the remainder may be used to purchase extended insurance for the full face value of the policy, less the amount of the indebtedness, or may be used to purchase paid-up insurance or taken in cash.

The "Table of Loan and Surrender Values" then follows and shows the loan value of the policy at the end of the fifth year to be $71 per $1,000 of insurance, and at the end of the sixth year $91 per $1,000 of insurance. There is a provision that, if the premium on the policy be paid in install-

ments, allowance will be made, in computing the benefits, for that portion of the premium paid over and above the number of years indicated in the table.

At the foot of the "Table of Loan and Surrender Values" appears this statement: "The loan and surrender values under this policy shall be based upon the Actuaries' Table of Mortality, with four (4) per cent. interest per annum, and the net value thereof is the entire reserve, less not more than two and one-half ($2\frac{1}{2}$) per cent. of the amount insured by the policy."

The undisputed testimony was that the loan and surrender values shown in the table were based upon the Actuaries' Table of Mortality with four per cent. interest per annum, and that the net value was the entire reserve, less approximately $1\frac{1}{2}$ per cent. of the amount insured by the policy, instead of the maximum $2\frac{1}{2}$ per cent. permitted.

The "Non-Forfeiture" or automatic extended insurance clause, before referred to, follows immediately after the table, and its purpose clearly is to make an election for the insured, where he has made none for himself from among the options granted.

It will be noted that the extended insurance referred to in the "Non-Forfeiture" clause is "the extended insurance hereinbefore provided." The only "extended insurance hereinbefore provided" was that referred to in the options and the table, and constituted that amount of extended insurance which the cash value of the policy, less the amount of the indebtedness, would purchase at the time of lapse.

The policy loan agreement, under which the insured secured the loan of $260, provided:

"4. That said loan shall become due and payable:

"(a) If the amount of this policy loan, together with any additional policy loan or past due indebtedness to the Company, with accrued interest, shall equal or exceed the cash value of said policy; in which event said policy, unless otherwise provided therein, shall lapse and determine, without demand or notice of any kind, every demand and notice being hereby waived, and all liability under this policy loan agreement shall thereby terminate.

"(b) Or, if any premium on said policy is not paid when due, then, at the expiration of the period of grace for the payment of said premium, this policy loan shall become due and payable and shall be paid by deducting the amount due thereon from the cash value of said policy and the balance only of said sum, if any, shall be applied to the purchase of extended or continued insurance without the right to loans or surrender values, for the full amount of the policy, less the amount of the indebtedness. The period for which said insurance shall be extended or continued shall be computed in accordance with the method followed in calculating extended or continued insurance in said policy."

The method for calculating extended insurance in the policy is provided for under the clause headed "Options on Surrender or Lapse," and is indicated in the "Table of Loan and Surrender Values." It consists of taking the cash value, which is the same as the loan value at the end of the preceding year, deducting existing indebtedness, and applying the balance to the purchase of extended insurance in an amount equal to the face of the policy, less the existing indebtedness.

The insured defaulted at the end of $6\frac{1}{2}$ years. The policy loan was $260. The cash value at the end of 6 years per $1,000 of insurance was $71, and at the end of 7 years $91. Therefore, at the end of $6\frac{1}{2}$ years, it was $81, or $405 for a $5,000 policy. Deducting $260 from $405, leaves $145 available for the purchase of extended insurance. Under the terms of the policy, the amount of insurance to be extended was $5,000 less $260 (the amount of the policy loan), or $4,740. It is conceded that $145 would have carried $4,740 worth of insurance, at age 32, which was the age of the insured at the time of lapse, for 3 years and 285 days, or up to September 8, 1928. There was no insurance in force on the 15th day of February, 1930, when the insured died.

The contention of the beneficiary is that, since there was no actual surrender of the policy to the company, the entire reserve, $475, less $260 (the amount of the policy loan), or $215, an amount which would have carried $4,740 of insurance beyond the date of death of the insured, was available at the time of lapse. The actuaries in their testimony had referred to the difference between the cash value provided for in the policy and the entire reserve as a "surrender charge," and this actuarial term led to the belief that, where there had been no actual surrender, there could be no surrender charge, and that therefore the full reserve was available for the purchase of extended insurance. It is also claimed that it does not clearly appear

from the terms of the contract that, in case of default in the payment of premiums and failure to exercise the option to surrender and take extended insurance, the entire reserve is not available for the purchase of extended insurance under the nonforfeiture provision, and that, since the insured is entitled to the benefit of the most favorable construction of any doubtful language, it should be held that the cash value was the entire reserve.

A careful reading of the terms of the policy indicates that the cash value is the same in case of lapse as it is in case of surrender of the policy under the option provisions, and that there is no basis for the application of the rule of construction sought to be invoked.

The Supreme Court, in Bergholm v. Peoria Life Ins. Co., 284 U. S. 489, 52 S. Ct. 230, 231, 76 L. Ed. ——, said:

"It is true that where the terms of a policy are of doubtful meaning, that construction most favorable to the insured will be adopted. Mutual Life Ins. Co. v. Hurni Co., 263 U. S. 167, 174, 44 S. Ct. 90, 68 L. Ed. 235, 31 A. L. R. 102; Stipcich v. Insurance Co., 277 U. S. 311, 322, 48 S. Ct. 512, 72 L. Ed. 895. This canon of construction is both reasonable and just, since the words of the policy are chosen by the insurance company; but it furnishes no warrant for avoiding hard consequences by importing into a contract an ambiguity which otherwise would not exist, or, under the guise of construction, by forcing from plain words unusual and unnatural meanings.

"Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense."

The judgment is reversed.