## IDA S. ERICKSON AND OTHERS v. EQUITABLE LIFE ASSURANCE SOCIETY OF UNITED STATES.[1]

January 18, 1935.

No. 30,114.

[1]Reported in 258 N. W. 736.

Kellogg, Morgan, Chase, Carter & Headley, for appellant.

Alfred T. Vollum and Meighen, Knudson & Sturtz, for respond-ents.

LORING, JUSTICE.

In a suit upon an insurance policy by the beneficiary and certain assignees of the policy, the plaintiffs, after a trial before a court without a jury, had findings, conclusions, and order for judgment in their favor, and the case comes here upon an appeal from an order denying defendant's motion for a new trial.

Aleck C. Erickson, the insured, president of the Albert Lea State Bank, sought life insurance in the sum of $25,000 with the defendant society. The application for the insurance was dated in part October 22, 1924, and in part December 20, 1924. The evidence indicates that an ordinary life policy in that amount with its annual premiums due on December 20 was issued under date of January 6, 1925. The evidence also shows that the contract was made with him by the defendant at a rate higher than the standard rate because he was classified as a substandard risk. The normal or standard rate would have been $1,265.50 for the coverage which he obtained, but he was required to pay and did pay $1,541.50 annually for the first two premiums. The amount of the premium was specified in the application. On the photostatic copy attached to the policy the figures are in part obliterated. In March, 1926, after these first two premiums had been paid, he was reclassified as of February 9, 1926, as a standard risk, and a new ordinary life policy with the same number as that previously issued was given him with the same register date, December 20, 1924, as the original policy. This is the policy in suit

and is dated January 6, 1925, but marked "Rewritten March 24, 1926." Across part one of the attached copy of the application the words "Reissued at standard rates" were indorsed. This was apparently a photostatic copy of the original application upon which the original policy was issued. No other application appears in evidence, and on part one of this one is marked "Reissue Policy #3551635 with register date Dec. 20, 1924." Mr. Erickson's signature appears below this so-called "special instruction." The reason for the rating of Erickson as a substandard risk is not shown by the evidence, nor is there any showing as to why he was reclassified in 1926 as a standard risk; but the evidence does show that he was so classified and reclassified as of dates stated above. At the time that he was reclassified as a standard risk as of February 9, 1926, there was repaid to him the excess premium from that date until the following policy anniversary, December 20, 1926, because on the previous December he had paid for a full year at the higher rate. This refund was $238.43 and was accepted and retained by Erickson, who paid the subsequent premiums at the standard rate until he defaulted in the quarterly premium due June 20, 1929. This premium was never paid.

August 1, 1929, Erickson applied for a reinstatement of the policy, submitting a report of the medical examiner, but his application was not accepted because the evidence of insurability was not satisfactory to the society. It requested additional medical evidence which Erickson never submitted, and the reinstatement was refused as of September 25, 1929, on account of failure to furnish the required evidence.

May 29, 1929, Erickson negotiated a loan on the policy amounting to $2,56 the full loan value of the policy on June 20, 1929. This loan repaid a previous loan of $2,200 and interest. Interest on the new loan to December 20, 1929, was likewise deducted. This left a balance of $220.71, which was paid to Erickson. Upon lapse on account of default in payment of premiums, the insured was entitled, under the terms of the policy, to have its cash surrender value applied in one of three ways. He might take the cash, or he might take such paid-up insurance or such term insur-

ance as the cash value would purchase, for the amount of the policy less the debt against it. If he made no election, the option for the term insurance was to take effect. He made no election, and consequently the extended term insurance became effective. According to the society's calculations, the advance interest of $74.47 was credited to the insured, and this reduced the net loan to $2,487.53, which deduction from the face of the policy left a balance of $22,512.47 as the face of the extended term insurance to be put into effect for the period $74.47 would buy. This amount was sufficient to effect term insurance for two months from the date of lapse, or to August 20, 1929. In arriving at the above result a surrender charge was deducted from the cash surrender value applicable to the purchase of extended insurance, and the validity of this charge is one of the major issues in this suit. Erickson died December 8, 1929, and if this surrender charge was wrongfully made the amount of the cash surrender value of the policy would have been sufficient to purchase extended term insurance beyond the date of his death.

■ The policy here sued upon was an ordinary life policy, and upon the oral argument it was conceded to be in standard Minnesota form. As a basis for computing the cash surrender value of the policy it provided that the reserve for which funds are to be held upon this policy be computed upon the American Experience Table of Mortality with interest at three per cent by the net level premium method. The values are stated in the table printed in the policy, and each is stated to be equal to the full reserve at the end of the then current policy year, less a surrender charge of not more than one and one-half per cent of the face value of the policy until the completion of the tenth policy year. A surrender charge not exceeding two and a half per cent is authorized by 1 Mason Minn. St. 1927, § 3399, which prescribes the standard forms for life insurance policies, and it is also authorized by 1 Mason Minn. St. 1927, § 3402, which sets forth the provisions which must be included in every policy, and is also authorized by 1 Mason Minn. St. 1927, § 3392, in regard to the net reserve applicable to automatic paid-up or extended insurance. We interpret all these stat-

utes to authorize such surrender charge to be deducted from the cash surrender value whether that be paid to the insured upon surrender of the policy or the secondary extended term insurance be purchased therewith. For instance, in subd. 8 of § 3402 the net value of the extended insurance is required to be:

"At least equal to the reserve at the date of default on the policy and on any dividend additions thereto, specifying the mortality table and the rate of interest adopted for computing such reserves, less a sum not more than two and one-half per centum of the amount insured by the policy, and any existing dividend additions thereto, and less any existing indebtedness to the company on the policy."

And in § 3399, the first standard form prescribed, the form for ordinary or limited payment life insurance under the subhead "Option on Surrender or Lapse" says:

"Cash value will be the reserve at the date of default * * *, less (here may be inserted not more than two and one-half) per centum of the amount insured by this policy and of any dividend additions thereto, and less any existing indebtedness. to the company on this policy. * * * The term for which the insurance will be continued or the amount of the paid-up policy will be such as the cash value will purchase as a net single premium at the attained age of the insured * * *."

1 Mason Minn. St. 1927, § 3392, provides:

"In event of default in payment of any premium due on any policy, * * * there shall be secured to the insured without action on his part, either paid or extended insurance as specified in the policy, the net values of which shall be at least equal to the entire net reserve held by the company on such policy, less two and one-half per centum of the amount insured by the policy and dividend additions, if any, and less any outstanding indebtedness to the company on the policy at time of default. There shall be secured to the insured the right to surrender the policy to the company at its home office within one month after date of default

for the cash value otherwise available for the purchase of the paid-up or extended insurance as aforesaid."

In Inter-Southern L. Ins. Co. v. Zerrell, 58 F. (2d) 135, 136, the circuit court of appeals of the eighth circuit had before it the exact question that is presented here. The court speaking through Judge Sanborn said [58 F. (2d) 136]:

"The contention of the beneficiary is that, since there was no actual surrender of the policy to the company, the entire reserve, $475, less $260 (the amount of the policy loan), or $215, an amount which would have carried $4,740 of insurance beyond the date of death of the insured, was available at the time of lapse. The actuaries in their testimony had referred to the difference between the cash value provided for in the policy and the entire reserve as a 'surrender charge,' and this actuarial term led to the belief that, where there had been no actual surrender, there could be no surrender charge, and that therefore the full reserve was available for the purchase of extended insurance. It is also claimed that it does not clearly appear from the terms of the contract that, in case of default in the payment of premiums and failure to exercise the option to surrender and take extended insurance, the entire reserve is not available for the purchase of extended insurance, under the nonforfeiture provision, and that, since the insured is entitled to the benefit of the most favorable construction of any doubtful language, it should be held that the cash value was the entire reserve.

"A careful reading of the terms of the policy indicates that the cash value is the same in case of lapse as it is in case of surrender of the policy under the option provisions, and that there is no basis for the application of the rule of construction sought to be invoked."

The provisions of the policy involved in the case at bar are plain. It provides:

"If there be any indebtedness against this policy, the cash surrender value shall be reduced thereby, the paid-up insurance shall be reduced proportionately, and the extended term insurance shall

be for the face amount of the policy less the indebtedness and for such period as the reduced cash value will purchase."

These loan and cash values are stated in a table which is made a part of the policy, and then the basis of computation which provides for the one and one-half per cent reduction within the ten-year period is clearly stated. The policy provides:

"The values stated in the opposite Table are mathematical equiv- alents and each is equal to the full RESERVE at the end of the then current policy year, on the basis stated in the preceding paragraph, less a surrender charge of not more than 1½% of the face of this policy until the completion of the tenth policy year, at which time and thereafter there is no deduction made as a surrender charge, except that fractions of a month and fractions of a dollar are not allowed."

We reach the conclusion that the surrender charge was properly deducted in calculating extended insurance.

■ We next consider the contention of the respondents that the rate fixed by the rewritten policy relates back to the inception of the contract and that in consequence there was in the hands of the society an excess premium payment of $313.57 which should have been made a part of the cash reserve or loan and surrender value of the policy to be applied to the purchase of extended term insurance, which would have carried the coverage past the date of Erickson's death.

Plaintiffs claim that in the absence of the first policy and of a showing upon which the classification as a substandard risk was made, the policy here in evidence, although rewritten March 24, 1926, and indorsed "Reissued at standard rates," was nevertheless to be considered the sole contract in regard to the rate of premium which should have been charged from the inception of the cover- age.

Our statute contemplates the insurance of substandard risks on underaverage lives, and if Erickson was so classified there was nothing illegal or discriminatory in charging him a higher premium rate than he would have had to pay if he were a standard risk.

Whether or not he was properly so classified is not a question here for review. The uncontradicted evidence of the unimpeached witness Bryan, the society's cashier at the St. Paul office, is positive to the effect that the original coverage was written at an enhanced rate of $1,541.50 because of a substandard risk from December, 1924, until February 9, 1926, when Erickson was reclassified as a standard risk and a refund of the difference between the standard premium and that for the substandard risk was made to and accepted by him and apparently thereafter acquiesced in until the coverage terminated. The policy bears on its face evidence that it was rewritten March 24, 1926, and that it was reissued at standard rates. It is true that the statute requires the policy to state the entire contract, and the policy so provides. Here we have a contract which shows on its face that it has been rewritten as of March 24, 1926, and reissued at standard rates. The testimony of the cashier in no way varies these provisions. From the date of rewriting, the contract is exactly as rewritten. It contains the entire contract. It would have been well to have had the original policy and the original application (a partially mutilated copy of which is attached to the rewritten policy), but there is nothing to indicate that the first policy did not also contain all the contract between the parties for the period terminating with its modification by the rewriting of the contract to express the modified contract which reduced the premium. Was the provision for a reduced premium retroactive to the inception of the coverage? In the face of the statement that on March 24, 1926, the policy was rewritten and that it was reissued at standard rates, we cannot import into its term a retroactive provision. Premiums had been paid at the substandard rate. The refund had been accepted at the reclassification to the standard rate. The parties by their conduct gave the contract a practical construction contrary to that now contended for by plaintiffs. The insured acquiesced in that construction and dealt with the insurer on that basis. Moreover, we think that the indorsements on the policy being as we have stated, the testimony of the cashier was admissible to explain what brought about the rewriting and the reissue. His testimony is in the case

uncontradicted and unimpeached either orally or by documents. It would be an extremely technical view that could spell out of the situation a mistake or error in the charge of the enhanced premium. An intent to make the rewritten policy retroactive as to rates is wholly without support in the evidence. From this record reasonable minds could not possibly conclude that the provision was retroactive or that the arrangement was other than just what the cashier stated it was. Hence there is no foundation for a finding of overcharge. A contrary finding is compelled if we take the facts as they actually were shown to be.

The plaintiffs contend that the entire cash surrender value of the policy without deduction for indebtedness to the society was applicable to the purchase of extended term insurance and that automatically, upon default in payment of premiums, term insurance for five years and two months took effect. They contend that in order to deduct the indebtedness from the cash surrender value the loan must be foreclosed and 31 days' notice given in accordance with the provision of the policy which states:

"Failure to repay such loan or to pay interest thereon shall not avoid this policy unless the total indebtedness hereon shall equal the total loan value, nor until thirty-one days after notice shall have been mailed to the Insured, and to the assignee of record if any, to their addresses last known to the Society."

Neither the law nor the contract requires such foreclosure. The plain terms of the policy authorize the deduction of the indebtedness from the cash value and require no foreclosure for that purpose. It must be kept in mind that we are dealing with a contract which the parties were free to make except as restrained by statute. Here the primary insurance lapsed for nonpayment of premium; there was no avoidance of the contract for nonpayment of the loan. The indebtedness still survived and as such, though not foreclosed, was by the very terms of the policy deductible from the cash value in accordance with the statute. This question was presented to this court in Schoonover v. Prudential Ins. Co. 187 Minn. 343, 245 N. W. 476, and there decided adversely to the plain-

tiffs' contention. The distinction between the ordinary commercial loan and a policy loan such as the one here involved is clearly made in Williams v. Union Central L. Ins. Co. 291 U. S. 170, 54 S. Ct. 348, 78 L. ed. 711, 92 A. L. R. 693. See also Board of Assessors v. New York L. Ins. Co. 216 U. S. 517, 522, 30 S. Ct. 385, 386, 54 L. ed. 597, 601, where with reference to loans it was said that such advances being against the surrender value do not create a personal liability or a debt of the insured, but are merely a deduction from the sum that the company ultimately must pay, and that, while the advance is called a loan and interest is computed in settling the account, "the item never could be sued for" and in substance "is a payment, not a loan." This question is disposed of in Palmer v. Central L. Assur. Soc. 193 Minn. 306, 258 N. W. 732.

■ Plaintiffs contend that the paid-up term insurance did not begin to run during the 90 days which, under the terms of the policy, were given to the insured after default in the payment of any premium to exercise an option as to which of the three methods of applying the cash surrender value he would elect, and further that this 90 days would not commence to run during the 31 days' grace. We do not so construe either the law or the policy. In the first place, the grace period is not paid for by the previous premium, and in the event of death during that period the premium due at the commencement of the grace period is to be deducted from the amount to be paid the beneficiary. To give the contract the construction placed upon it by the plaintiffs would be to give 13 months' insurance for 12 months' premium. When the new premium is not paid during the grace period, default takes place as of the date when the premium was due, and the secondary or extended term insurance becomes effective as of the date of default unless some other option is exercised during the 90-day period given to the insured for that purpose. We so held in the Schoonover case, 187 Minn. 343, 245 N. W. 476. Hutchinson v. National L. Ins. Co. 196 Mo. App. 510, 195 S. W. 66; Wilkie v. New York L. Ins. Co. 146 N. C. 513, 60 S. E. 427.

It is equally clear that plaintiffs' contention in regard to the 90-day period is ill founded. To sustain it we would have to hold.

that the society carried the risk for that period without compensation. This would amount to discrimination. What really happens upon default in payment of the premium is that during the grace period the insured is tentatively indebted to the company for the new premium, which in case of loss is deducted from the payment made under the policy; but if loss does not occur and the premium is not paid during the grace period, the default takes effect as of the due date of the premium, and automatically the extended insurance goes into effect as of that date, subject to the insured's right during the three-month period to choose one of the other two options as a substitute therefor. Schoonover v. Prudential Ins. Co. 187 Minn. 343, 245 N. W. 476.

■ It is claimed by the plaintiffs that the correspondence with certain of the assignees after default in payment of the premiums amounted to a waiver of the default. This claim seems to be based upon a request that the assignment of the policy be acknowledged by the assignor which request was contained in a letter under date of October 8, 1929, from the company to one of the assignees who appeared to be conducting the correspondence for all the assignees. It appears that in the same letter this assignee was advised that the premium on this policy had been paid to June 20, 1929, only, and as the policy stood it had lapsed and reinstatement had been denied. (The correspondence also referred to another policy.) With this statement in mind it can hardly be said that there was any expression of purpose to waive or that by any statement made by the defendant the assignees were lulled into any sense of security or on that account failed to take other steps to indemnify themselves against loss. The trial court made no finding of waiver.

■ We have considered the plaintiffs' contention that the trial court abused its discretion permitting an amendment to the defendant's answer and find it without merit. The complaint alleged the policy. The policy sued upon showed upon its face that a loan was outstanding, and the terms of the policy showed that such loan was deductible from the cash surrender value. An amendment would scarcely have been necessary to show the loan or its

effect upon the term insurance. As to the other allegations of the amendment which referred to the contract before modification, these conformed to the proof. As the trial court well said, it would have been abuse of discretion to refuse the amendment.

The order denying a new trial must be reversed. The record shows that the case for the plaintiffs has been thoroughly presented and that justice would not be furthered by a new trial. We therefore remand the case with directions to amend the findings and conclusions in accordance with the views herein expressed and to enter judgment for the defendant.

DEVANEY, CHIEF JUSTICE (dissenting).

In my view there should be a new trial to allow evidence to be taken on the single issue of whether or not the policy when rewritten March 24, 1926, and dated back to December 20, 1924, also related back to December 20, 1924. If it did relate back, then insured had on deposit with the company $313.57 at the time the policy lapsed. This amount was sufficient to purchase term insurance through and beyond the date of his death.

The evidence shows only that Erickson was originally insured as a substandard risk. Because of this he paid a higher annual premium than that paid by standard risks. He had paid two annual premiums at the higher rate when the company, during the second year the policy was in force, reclassified him as a standard risk. Thereafter he was required to pay only the standard rate. The policy, as then rewritten, was dated back to December 20, 1924, the date of original issue. After this reclassification Erickson was refunded only that part of the second year's premium which represented the difference between the higher rate and the standard rate from and after the date of his reclassification. He was refunded none of the excess premium paid for the first year.

On this statement of facts it might well be found that the company had made a mistake in the first instance in classifying Erickson as a substandard risk and that upon discovery of the mistake reclassified him but neglected to refund the excess premium that had been paid during the first year and part of the second.

There is absolutely no evidence as to why this reclassification was made. If the company did not make a mistake in the first instance in writing Erickson as a substandard risk and if Erickson's physical condition was such that he should have been insured originally as a substandard risk, the insurance company could easily have shown such fact. It did not do so. This leaves an inference that perhaps there were no such facts and that the subsequent reclassification was made because of an error in the first instance. There can be no question but that if the substandard classification was erroneous, Erickson should have been entitled to a refund of the excess premium paid for the first year and part of the second, and that, not having received the same, he had sufficient funds on deposit to purchase term insurance beyond the date of his death.

There is a difference between rewriting a contract and adding to or amending it or changing one of its terms by subsequent agreement. If the rewriting was intended merely to be a termination of the subnormal classification up to that time, the natural and simple method, it seems to me, would have been to attach an ordinary rider to the policy stating that the change had been made. The fact that there was a rewriting of the entire policy relating back to its inception rather impresses me with the idea that the subnormal classification in the original was merely a mistake and that a rewriting was for the purpose of correcting the error rather than for the purpose of simply changing the classification because of any change in the situation of the insured. The fact that the policy when rewritten was dated back is persuasive that error had been made in the first instance.

For the reasons above stated, I think there should be a new trial. This will permit the insurance company to show the facts as they exist. In the absence of a showing that the original classification was not a mistake, I think the plaintiffs should prevail.

I. M. OLSEN, JUSTICE.
I concur in the dissent of the Chief Justice.