ANNA C. DAVIS, RESPONDENT, v. MUTUAL LIFE INSURANCE COMPANY, A CORPORATION, APPELLANT.—119 S. W. (2d) 488.

St. Louis Court of Appeals.   Opinion filed September 9, 1938.

Motion for Rehearing Overruled September 23, 1938.

Petition for Writ of Certiorari Denied November 15, 1938.

*Dubinsky & Duggan* for respondent.

*Jones, Hocker, Gladney & Grand* and *Vincent L. Boisaubin* for appellant (defendant).

*Frederick L. Allen,* of counsel..

McCULLEN, J.—This action at law was begun by Anna C. Davis, hereinafter called plaintiff, against the Mutual Life Insurance Company of New York, a corporation, hereinafter referred to as defendant, on four policies of life insurance which had been issued by defendant to George B. Davis. It was stipulated by the parties in the trial court that all four actions should be consolidated and proceeded with as one cause, which was accordingly done.

A trial before the court and a jury resulted in verdicts in favor of plaintiffs and against defendant on each of the policies upon which a judgment in favor of plaintiff and against defendant was rendered

in the aggregate sum of $5170.10. Defendant in due course has brought the case to this court by appeal.

The policy provisions with which we are chiefly concerned in connection with this appeal are as follows:

"Section 6. Cash Value. At any time after at least three full years premium have been duly paid but not later than three months after default in payment of premium, this policy may be surrendered for its net cash value. Such net cash value shall be the cash value as defined below less any indebtedness to the Company hereon.

"(a) If all past due premiums have been paid, (1) the cash value on any anniversary of the date of the policy or any premium due date other than an anniversary shall be the reserve at such time for the face amount of this policy and for any dividend additions hereto increased by any accumulated dividend deposits and less a surrender charge of not more than one and one-half per cent of the face amount of this policy, or (2) the cash value on a prior date shall be the cash value mentioned in (1) less interest thereon at the rate of six per cent a year.

"After the policy has been ten years in force there shall be no surrender charge.

"(b) During three months after the due date of any premium in default the cash value shall be the same as at such due date except as decreased by the surrender of dividend additions or withdrawal of dividend deposits.

"After any premium has been in default more than three months from its due date, this policy shall have no cash value.

"Section 7. Options on Lapse. (a) Continued Term Insurance.— If any premium remain unpaid at the end of the days of grace, and if at least three full years' premiums have been paid, this policy will, without action on the part of the insured, continue, as from the due date of such premium in default, as paid-up non-participating term insurance.

"The amount of such term insurance shall be the face amount of this policy increased by any dividend additions and by any dividend deposits and decreased by any indebtedness to the company on this policy. The term shall be such as the net cash value at such premium due date provided for in section 6 (adjusted for any later loans, surrender of dividend additions, or withdrawl of dividend deposits) applied as a net single premium will purchase.

"Within three months after the due date of such premium in default either of the following options may be exercised instead of having the policy continued as such term insurance.

"(b) Cash Value.—The policy may be surrendered for the net cash value provided for in section 6; or,

"(c) Paid-Up Insurance.—The policy may be surrendered for paid-up non-participating life insurance payable at the same time and upon the same conditions as this policy, the amount of such paid-up

insurance being such as the net cash value applied as a net single premium will purchase.

"Section 8. Table of Cash and Loan Value and Options on Lapse. These values are computed in accordance with the provisions of sections 5, 6 and 7 and are on the assumption that all premiums to end of years indicated have been paid and that there are no dividends or indebtedness.

"Any dividend additions or dividend deposits will increase such values and any indebtedness to the company on this policy will decrease such values as provided in the above mentioned sections.

"Values for intermediate periods for which premiums have been paid will be calculated as provided in sections 5, 6, and 7."

Immediately following, as a part of section 8 of the policy, is a table showing the cash value as well as the loan value, as explained in section 5 of the policy, for each $1000 face amount thereof at the end of each policy year beginning with three years and ending with thirty years. The table also shows the paid-up non-participating life insurance for each $1000 face amount of the policy at the end of each policy year, beginning with three years to and including thirty years. According to said table, the cash value for each $1000 of the face amount of the policy at the end of the eighth policy year is expressly stated to be $88.28.

The provision of the policy upon which plaintiff bases her contention is as follows:

"Section 9. Reserves and Net Single Premiums. The reserve held for the face amount of this policy and for any dividend additions, and the reserves and net single premiums mentioned in this policy shall be computed in accordance with the American Experience Table of Mortality assuming interest at the rate of three per cent a year, the net single premiums being those at the attained age of the insured."

Section 5 of the policies provided for the terms and conditions under which loans may be made upon the security of the policies themselves. Since there is no dispute concerning the loans which were made to the insured by the defendant, it is unnecessary to set forth here said section of the policies.

It appears from the record, without dispute, that on May 8, 1925, defendant issued its policy No. 3478288 for $5000 upon the life of George B. Davis, in which Anna C. Davis, his mother, plaintiff herein, was named as beneficiary. The insured at that time was thirty years old. At the request of the insured and the beneficiary, made on November 4, 1932, defendant split up the $5000 policy into four policies which were issued by defendant on December 5, 1932, as follows: Policy 3574643 for $2000; policy 3574644 for $1000; policy 3574645 for $1000; and policy 3574646 for $1000. Each of the policies was dated as of May 8, 1925, which was the date of the

original $5000 policy. Plaintiff was named as beneficiary in each of said four policies. The annual premium required to be paid by the terms of the $2000 policy was $48.76. Each of the $1000 policies provided for an annual premium of $24.38.

It further appears from the record, without dispute, that on September 8, 1932, defendant had granted a loan in the sum of $411.20 on the $5000 policy. It was provided that the loan would mature May 8, 1933. Later, when the $5000 policy was split up, the loan was split up and apportioned as follows:

$164.48 thereof to the $2000 policy, and $82.24 thereof to each of the three $1000 policies. The note for $411.20 representing the loan as originally made, was surrendered to the insured and new notes were executed, dated as of the same date, September 8, 1932, one for $164.48 and three for $82.24 each, said notes being apportioned to the four substituted policies respectively. Each of said loans was due on May 8, 1933. None of said loans was paid on May 8, 1933, nor were the premiums due on any of the policies paid on that date, or within thirty-one days thereafter which was the period of grace for the payment of premiums provided for in each of the policies. The policies, therefore, lapsed on May 8, 1933.

The record further shows, without any dispute, that, on June 29, 1933, the insured made application for reinstatement of said policies, and on the same date requested an extension of time to pay the premiums thereon and the loans which had become due on May 8, 1933. The application for reinstatement was granted, as was also the request for an extension of time to pay the premiums and the loans, the extension being granted for three months. That extension expired on August 8, 1933, but there was a grace period of thirty-one days thereafter. The fees for said extension privileges were $5.96 for the $2000 policy, and $2.98 for each of the $1000 policies. An extension agreement was executed by the insured and defendant wherein May 8, 1933 was referred to as the "due date" for the payment of premiums. Said extension agreement expressly provided that, if the premiums and the interest on the loans were not paid on or before August 8, 1933, or within thirty-one days thereafter, "said policy shall thereupon cease, lapse, and become void as of said due date except as otherwise provided in the policy." The extension agreement further provided "that said extension fee shall in no event be considered as payment in full or in part of said premium or said policy loan interest."

It further appears from the record, without dispute, that on May 8, 1933, there was a dividend apportionable to the $2000 policy amounting to $12.98. Out of said dividend the extension fee of $5.96 and interest of $6.54 then due on the loan on the $2000 policy were paid, leaving a dividend credit of 48c. The dividend apportionable to each of the $1000 policies was $6.49, out of which the extension

fee of $2.98 and interest of $3.27 then due were paid, leaving a dividend credit amounting to 24c on each of the $1000 policies. Thereafter, by similar extension agreements, the time of payment of the premiums and of the policy loans on each of the four policies was extended to November 8, 1933, with a grace period of thirty-one days thereafter. Neither the loans nor the premiums on the policies were paid within the period of time provided for by the extension agreement. On December 9, 1933, all four policies lapsed for non-payment of premiums which had become due and payable on May 8, 1933, under the provisions of the extension agreements.

It further appears from the record, without dispute, that the insured paid eight full annual premiums on the policies, and that he died on August 27, 1934.

The theory of plaintiff at the trial was that, by virtue of section 9 of each policy, there was sufficient value in each policy apportionable to the purchase of extended insurance to keep each of the policies in force beyond the date of the insured's death. Plaintiff stands on that theory in this court.

Defendant contends that the cash value as expressly set out in the policy itself, and not the entire reserve, is the proper basic figure for determining the period of extended or term insurance under the provisions of sections 6, 7, 8, and 9 of the policy. On the other hand, plaintiff contends that the reserve value of the policy is the value that purchases the extended term insurance. The question, therefore, to be determined is whether plaintiff is entitled to the full reserve on the policy, amounting to $93.28, as a basic figure for the purchase of extended insurance, or is limited to the cash value of $88.28 for that purpose.

The two important elements to be determined at the outset of our consideration of this case are the "amount" of the extended or term insurance, and the "term" thereof.

In section 7 of each of the policies, it is provided that the "amount" of such term insurance "shall be the face amount of this policy increased by any dividend additions and by any dividend deposits, and decreased by any indebtedness to this company on this policy."

Taking, as an example, the face amount of one of the $1000 policies, the undisputed evidence shows that the dividend addition was $1.00 which made the total face amount of the insurance $1001. The indebtedness was conceded to be $82.24, so that the net "amount" of insurance was $918.76, to which, under the company's rules, was voluntarily added the sum of 24c, making the net amount of insurance $919. As to the "term" of said insurance, we find that section 7 of each of the policies provides that it "shall be such as the net cash value at such premium due date, provided for in section 6 . . . applied as a net single premium will purchase." As to the net cash value which, under the provisions of the policies, is to be

used as a net single premium to purchase the extended insurance, section 6 (a) of the policies provided that the cash value (on May 8, 1933, the eighth anniversary thereof) shall be "the reserve at such time for the face amount of this policy and for any dividend additions hereto, increased by any accumulated deposits and *less a surrender charge of not ·more than one and one-half per cent of the face amount of this policy.*" (Italics ours.)

The actuaries for both parties agreed in their testimony that the entire reserve was $93.28. It is also undisputed that the amount of the surrender charge was $5. Deducting that surrender charge from the entire reserve of $93.28 leaves $88.28 as the cash value of the policy exactly in accordance with the amount specifically set forth in the table in section 8 of the policies. To be added to the last-mentioned amount is the sum of 24¢, representing the cash value of the dividend addition which remained out of the dividend of May 8, 1933, on the policy, thus making the total cash value of the policy $88.52. Deducting from the last-mentioned amount the indebtedness of $82.24, in accordance with the provisions of section 8 of the policies, we arrive at $6.28 as the net cash value of each of the $1000 policies, and twice that sum for the $2000 policy, to be used for the purchase of the extended or term insurance. The actuaries for plaintiff and defendant, respectively, agreed in their testimony that the net cash value amounting to $6.28, determined in the manner which we have heretofore set forth, was not sufficient to carry the policies in force and effect up to the date of the death of the insured.

It is contended by plaintiff, however, that the foregoing method of determining the amount available to purchase the extended insurance should not be employed because the insured never did exercise the privilege available to him of surrendering the policies. Plaintiff insists that section 6 of the policies has no application in this case, and argues that section 6 deals with the cash value upon surrender of the policies, and points out that none of the policies involved herein was ever surrendered or intended to be surrendered. Plaintiff earnestly contends that, under section 9 of the policies, she is entitled to the full reserve with which to purchase the extended or term insurance instead of being limited to the net cash value. A reading of section 9 of the policies shows clearly that the rights given to the insured with respect to extended insurance are not given by that section. That section does not deal with extended insurance at all. It merely provides the name of the table of mortality and the rate of interest upon which the company's reserve shall be computed. The right to extended insurance is found in section 7 of the policies, which must be read in conjunction with sections 6 and 8 relating to the rights granted to the insured under the policies.

In order to reach the conclusion contended for by plaintiff herein, it would be necessary for us to ignore completely that part of each

policy which provides, in section 6(a) for the deduction of a "surrender charge of not more than one and one-half per cent. of the face amount of this policy," and read into Section 9 the right to extended insurance, which section has nothing whatsoever to do with the granting of that right. We have no authority to read out of the policies any of their proper provisions, nor may we lawfully read into them a meaning which clearly was not intended by the parties thereto. Plaintiff contends that the policies are susceptible of two meanings, and, therefore, should be interpreted most favorable to the insured. The case of Schmohl v. Travelers Ins. Mo. (Mo. App.), 189 S. W. 597, is cited in support of her contention.

There can be no doubt of the soundness and wholesomeness of the principle invoked by plaintiff. The records of this court show that we have not hesitated to apply that principle whenever the facts of record in a case justify its application. However, a fair and reasonable reading of the provisions of the policies under consideration in the case at bar shows that thew are not open to the charge of ambiguity made by plaintiff against them. The charge of ambiguity made by plaintiff is based upon the provisions of section 6(a) for the deduction of a surrender charge when, as plaintiff contends, the policies were not surrendered. We think the surrender charge could more appropriately be termed a service charge, but the fact that it is called a surrender charge cannot be said to be misleading in any respect whatsoever in view of the table shown in section 8 of the policies, which definitely, expressly, and explicitly states that the amount to be used for determining the "term" of the extended insurance for each $1000 face amount of the policy at the end of the eighth policy year was $88.28. In view of the explicit statement of that amount in the table of section 8, it cannot be said that there is any ambiguity in the policies as contended by plaintiff.

We think the language of the Supreme Court of the United States in Williams v. Union Central Co., 291 U. S. 170, 180, is strikingly applicable to the case at bar. In that case the court said:

"While it is highly important that ambiguous clauses should not be permitted to serve as traps for policyholders, it is equally important, to the insured as well as to the insurer, that the provisions of insurance policies which are clearly and definitely set forth in appropriate language, and upon which the calculations of the company are based, should be maintained unimpaired by loose and ill-considered interpretations."

Under section 5741, Revised Statutes of Missouri, 1929 (Mo. Stat. Ann., sec. 5741, p. 4388), sometimes referred to as the non-forfeiture statute, or as the extended insurance statute, the defendant in the case at bar was required to allow to the insured three-fourths of the reserve of each policy upon the lapse thereof, thus leaving to defendant the right to retain the remaining one-fourth of such reserve.

It will thus be seen that, under the provisions of the policies involved herein, defendant was allowed to retain, upon the lapse thereof, an amount which was less than it was authorized to retain, and could have retained under the statute.

We deem it unnecessary to go into the history of non-forfeiture or extended insurance statutes, or to discuss the reasons underlying the adoption by the Legislature of such laws. It is sufficient, for the purposes of this case, to say that, under such statute, the defendant had a right to use up to one-fourth of the reserve of each policy as a service charge or surrender charge as it is called in the policies. Plaintiff cites no authorities to support her contention that the surrender charge of $5 should not be allowed in favor of defendant, but that the full reserve should be allowed in favor of the insured notwithstanding the express agreement of the parties to the contrary. On the other hand, the courts of many states have decided against the view contended for by plaintiff.

The contention made by plaintiff in the case at bar is exactly similar to the contention made by plaintiff in Brown v. Mutual Life Insurance Co. of New York, decided by the Supreme Court of South Carolina in February, 1938. That was a suit on a policy of life insurance in which the plaintiff therein was beneficiary. At the trial there was a judgment for defendant, and plaintiff appealed. Answering the contention of plaintiff in that case, the court said:

"The appellant claims that the right to deduct a surrender charge is restricted to the cases in which the policy is actually and manually surrendered to the company in exchange for its cash value. This contention is without merit for the reason that the options to surrender the policy for its cash value or for paid-up insurance, or for extended term insurance, are all dependent upon, in amount or term, the amount of the *cash value* remaining in the policy. As such cash value is the residue of the reserve, plus dividend additions or deposits, less the outstanding indebtedness and a surrender charge of not more than 1½ per cent., such surrender charge must be considered before any of the options can be exercised." [Brown v. Mutual Life Ins. Co. of New York, 195 S. E. 552, 555.]

The general rule with respect to such a surrender charge is that, in the absence of any statute to the contrary, a provision of the policy permitting an insurer to deduct a certain percentage of the amount insured from the reserve is valid. [37 C. J. 514.]

In Carter v. Mutual Benefit Life Ins. Co. (Ala.), 161 So. 446, under the non-forfeiture provision in a life insurance policy which provided for automatic extension of insurance purchasable by the cash surrender value in the event of a default in payment of premiums, the Supreme Court of Alabama held that a surrender charge should be deducted from the reserve to find the cash surrender value in determining the extended insurance, even though the policy was not surrendered. In that case the court said:

"The term 'surrender charge' is not defined in the policy, nor by the evidence. Nor does it appear what service or circumstance is its justification. We think it is immaterial that it is called a surrender charge, rather than that no term should be applied. We have read many cases where policies are considered which provide for such a deduction, without naming it. In some the evidence was that it is an actuarial term, and in them all it is so calculated whether so called. [Inter-Southern Life Ins. Co. v. Zerrell (C. C. A.), 58 F. (2d) 135, 137; Moss v. Aetna Life Ins. Co. (C. C. A.), 73 F. (2d) 339; Lamar Life Ins. Co. v. Minor, 170 Miss. 223, 154 So. 542; Mutual Benefit Life Ins. Co. v. O'Brien (Ky.), 116 S. W. 750.] We may as well conjecture that it is intended to care for the initial expenses of the company incident to the procurement and issuance of the policy, and which is amortized by the payment of the first three annual premiums, as to conjecture, as appellant does, that it was intended to compensate the company for services made necessary by physical surrender of the policy. But whatever may be the reason for it, it is distinctly provided that the term of the extended insurance shall be controlled by the amount of the cash surrender value (though the policy is not surrendered), and it is also distinctly provided that the value shall be ascertained by deducting 1 per cent of the amount of the policy from the reserve and computed upon that basis. It is immaterial what name is applied to the amount thus deducted. Such clarity of stipulation eliminates all idea of construction, and leaves to the court the duty to give it effect as thus expressed." [Carter v. Mutual Benefit Life Ins. Co., 161 So. 446, 447.]

In Bene v. New York Life Ins. Co. (Ark.), 87 S. W. (2d) 979, in a case involving a life insurance policy which provided that the amount available upon default in payment of premiums for extended insurance was the cash surrender value as determined by the reserve on the face of the policy at the date of the default less a surrender charge, the Supreme Court of Arkansas held that the insurer could properly deduct the surrender charge in determining the amount of extended insurance to which the insured was entitled upon the default. The court in that case pointed out (l. c. 982) that such a surrender charge provided for had been upheld by the courts of other states where there was no statute prohibiting such surrender charge; and there being no statute in Arkansas prohibiting the making of such a contract of insurance, it was valid and not against public policy.

In Erickson v. Equitable Life Assur. Soc. of United States, 258 N. W. 736, the Supreme Court of Minnesota upheld and enforced a surrender charge in a policy of life insurance, and said that such a charge was properly deductible from the cash surrender value whether the value was sought by surrendering the policy or was applied automatically to the purchasing of term insurance upon default in the

payment of premiums. Another case to the same effect by the same court will be found in Palmer et al. v. Central Life Assur. Soc. of United States (Minn.), 258 N. W. 732.

In Life Insurance Co. of Virginia v. Sluss, 11 N. E. (2d) 500, the Appellate Court of Indiana *in banc* held valid and enforcible the provisions of a life insurance policy which authorized the insurer to make a deduction of not to exceed 2½ per cent from the full reserve on the policy in order to ascertain the cash surrender value thereof in computing the amount available with which to purchase extended insurance upon the lapse of the policy by default.

There is no statute of Missouri which prohibits the deduction of a surrender charge such as is provided for in the policies involved herein. In the absence of a statute or a provision in the policy itself providing that the insured shall be entitled to the reserve, or a particular portion thereof upon the lapse of a policy, which shall be available to the insured either in cash or in paid-up insurance, such reserve upon the lapse of the policy belongs to the insurer, as was held in Elms v. Mutual Benefit Life Ins. Co., 211 Mo. App. 514, 231 S. W. 653, where the court said:

"In view of the fact that there was no statute in effect at the time governing the disposition of the reserve, and where, as here, the policy did not accord to the assured the benefits of the reserve upon lapse either for cash surrender value or for paid-up or extended insurance, the reserve belonged to the company and not to the assured. [Payne v. Ins. Co., 195 Mo. App. 512; State ex rel. v. Vandiver, 213 Mo. 187, 214; Wilhelm v. Ins. Co., 227 S. W. 897; Elms v. Mutual Benefit Life Ins. Co., 211 Mo. App. 514, 524, 231 S. W. 653, 657.]"

See, also, Spears v. Independent Order of Foresters (Mo. App.), 107 S. W. (2d) 126, where the court held that no right to extended insurance, cash surrender values, or a paid-up policy exists unless the policy itself or a statute so provided.

In the case at bar, it is clear that the defendant, by the terms of the policies, agreed to allow and did allow the insured a part of the reserve; and, since it was not required by any statute to allow a larger part of such reserve than it did allow, there can be no complaint against the policies on the ground of invalidity in that respect.

Plaintiff contends further that the extension fees paid by the insured to secure the extension of time from May 8, 1933, to November 8, 1933, to pay the premiums which were due on May 8, 1933, amounting to $11.93 on the $2000 policy, and $5.97 on each of the $1000 policies, should be added to the reserve or cash value available for the purchase of extended insurance, and thereby the insurance would be extended beyond the date of the death of the insured. We are unable to agree with plaintiff's view on this question. The evidence shows unequivocally that, under the terms of the extension agreements, the

primary insurance, as distinguished from the extended insurance, was continued in force from May 8, 1933, to November 8, 1933. The defendant company certainly could not be expected to carry such primary insurance in force during that period without being paid therefor. Furthermore, it was expressly agreed by the insured when he signed the extension agreement that "said extension fees shall in no event be considered as a payment in full or in part of said premiums." There is no ambiguity in the above-quoted language. It is clear, plain, and simple, and, under the terms of said agreement, the payment of extension fees cannot be considered as payment of the premiums or any part of the premiums.

Extension agreements similar to those involved in the case at bar have been passed upon by the courts of various states and have been upheld. The general rule deducible from the various cases passing on the question is to the effect that an extension fee paid to an insurer for carrying the primary insurance in force for an additional period of time belongs to the insurer and does not constitute a payment or part payment of the premium, and should not be added to the reserve or cash value of the policy in computing extended insurance. [Marek v. Mutual Life Ins. Co., 279 N. Y. S. 532; White v. New York Life Ins. Co. (Mass.), 86 N. E. 928; Robnett v. Cotton States Life Ins. Co. (Ark.), 230 S. W. 257; Underwood v. Jefferson Standard Life Ins. Co. (N. C.), 98 S. E. 832; Inter-Southern Life Ins. Co. v. Omer (Ky.), 38 S. W. (2d) 931; Eddie v. New York Life Ins. Co. (Cal.), 242 Pac. 501; Slocum v. New York Life Ins. Co., 228 U. S. 364.]

In view of the plain and clear provisions of the policies and the evidence adduced by both parties, the trial court should have sustained the peremptory instruction in the nature of a demurrer to the evidence offered by defendant, and should not have submitted the case to the jury.

It is, of course, regrettable that the insured was not covered by the policies at the time of his death, but that is a matter over which no one but he had control. We must take the contracts of insurance just as they were agreed to by the parties. We have no authority to do anything other than to give them effect according to their plain and unequivocal language. Our Supreme Court has said:

"Courts are without authority to rewrite contracts, even insurance contracts, although it may appear that in some respects they operate harshly or inequitably as to one of the parties; they discharge their full duty when they ascertain and give effect to the intentions of the parties as disclosed by the contract which they themselves have made. [Interstate Business Men's Acc. Assn. v. Nichols, 143 Ark. 369, 220 S. W. 477; State ex rel. v. Cox, 322 Mo. 38, 14 S. W. (2d) 600; State ex rel. v. Trimble, 306 Mo. 295, 267 S. W. 876; State ex rel. v. Trimble, 297 Mo. 659, 249 S. W. 902; Winters v. Ins. Co., 221

Mo. App. 519, 290 S. W. 109; Prange v. Internatl. Life Ins. Co. of St. Louis, 329 Mo. 651, 661, 46 S. W. (2d) 523, 526.]''

Under the law and the evidence, it is our plain duty to hold that plaintiff is not entitled to recover under the lapsed policies herein, and the judgment is accordingly reversed. *Hostetter, P. J.*, and *Becker, J.*, concur.